UNITED STATES of America,

v.

Robert **WILLIAMS** and Henry Watson, Defendants.

United States District Court
S. D. New York.
July 3, 1963.

1. 28 U.S.C. §§ 1346(b), 2671–2680.

2. 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152.

for the United States; by Martin R. Gold, Asst. U. S. Atty., of counsel.

Stone & Diller, New York City, for defendant Henry Watson.

Selig Lenefsky, New York City, for defendant Robert Williams; by Joseph I. Stone, New York City, of counsel.

CROAKE, District Judge.

On the evening of December 17, 1962, Agents Kreppein, Haridopolos, and Heer, of the Federal Bureau of Narcotics, entered Apartment 2-E at 141 West 116 Street, New York City, and arrested defendant Robert Williams. They then searched the premises and found a quantity of narcotics. Later that night the other defendant, Henry Watson, rang the door chimes of the apartment and was arrested by Agent Heer. A search of his person revealed 159 packets of narcotics in his jacket pockets. Both defendants were subsequently indicted for violation of the narcotics laws (21 U.S.C. §§ 173, 174), and both moved to suppress the narcotics evidence—Williams, as to that found in the apartment, and Watson as to that found on his person.

A hearing on the motions was held before the undersigned, at which both defendants, an additional defense witness, and the three narcotics agents testified. There was no dispute as to the above stated facts nor as to the facts that there was no consent given by either defendant to the searches and that the agents did not use a search or an arrest warrant as to either.

The sole ground relied upon by the Government to sustain the legality of the seizures is that they were incident to lawful arrests in both instances. In support of this contention, Federal Bureau of Narcotics Agent John Kreppein testified as follows:

On October 10, 1962 Agent Kreppein was maintaining surveillance of Wilhelmina Adams, during which he observed her enter and leave the premises at 141 West 116 Street. Immediately, thereafter, another agent purchased narcotics from her. Agent Kreppein again observed

Robert M. Morgenthau, U. S. Atty. for the S. D. of New York, New York City,

Miss Adams enter and leave that building on October 17, 1962 and, after she had entered and left another building several blocks away, she gave narcotics to another agent. On December 17, 1962 Agent Kreppein arrested Wilhelmina Adams for narcotics violations. She agreed to cooperate with the Government and stated that her source of supply was the defendant Williams and that Williams lived in Apartment 2-E at 141 West 116 Street, where he was engaged in selling narcotic drugs from "dusk to dawn." She told the agents that his *modus operandi* was, upon the arrival of a customer, to open the door with the chain latch on in order to identify the customer and then to take the chain off and let the customer in. Agent Kreppein took Miss Adams to the office of the Bureau of Narcotics where he found in the files that Williams had been arrested on eight occasions, once by the Federal Narcotics Bureau, and on other occasions by the New York City Police Department. The file further indicated that the arrests took place in Apartment 2-E, and contained a picture of Williams which Miss Adams identified. Thereafter, about 7 o'clock that evening, Agent Kreppein and his two fellow agents went to the apartment building at 141 West 116 Street and kept Apartment 2-E under surveillance from a hall stairway. They observed a succession of five persons, all appearing to be narcotic addicts, ring the door chimes and leave after receiving no answer. The agents left after about an hour and returned about 10 p. m. They saw another person ring the chimes, heard a peephole door click shut, and observed the door open part way, with the chain latch on, close, and open again to admit the individual at the door. A short time later, that person left the apartment. This routine was followed with a second person, and then with a third. Before the third person had left, Agent Kreppein rang the chimes himself and the door was opened with the chain latch on. He identified himself to Williams and told Williams that he was there to arrest him for violation of the narcotic laws. Williams attempted to slam the door shut but Agent Kreppein "rammed" a "two-by-four" piece of wood into the door so that it could not be closed. The other two agents then "hit" the door breaking the chain. Agent Kreppein entered the apartment and placed Williams under arrest. The agents found two glassine envelopes on the floor and eight on the sofa of the room into which they had entered. Each envelope contained a white powder subsequently identified as an opium derivative. The agents searched Williams and found that he was carrying $1,284 in cash on his person. Upon being questioned, Williams first denied that the narcotic drugs were his, but later admitted that they were. He stated that his source of supply was a moonfaced Negro of heavy build, medium height and medium brown complexion, who was expected to arrive in about an hour with a quantity of drugs. The agents waited in the apartment, and about 1 a. m. on the morning of December 18, defendant Watson, who fit the description given, rang the chimes. Agent Heer opened the door and saw him standing in the hallway. Watson began to flee, and as he ran into a banister Agent Heer observed him expose a tinfoil package. The agent identified himself, told Watson that he was under arrest, searched him, and seized the 159 packets of narcotics wrapped in four tinfoil packages. On cross-examination, Agent Kreppein admitted that he and the other agents did not know Williams was in the apartment before Williams opened the door.

The testimony of the other two agents was in substantial agreement to that of Agent Kreppein.

As to the facts solely relevant to the instant motions, nothing in the defense testimony was in material conflict with that of the Government, except that Williams stated that the agents did not identify themselves or announce their purpose until after they had crashed into the apartment, and except that both defendants testified that they had not met each other prior to December 18.

The court finds the testimony of the agents fully creditable and, further finds

that the defense testimony, in so far as it is in conflict with that of the Government, is not worthy of belief.

## I

Since it is conceded that neither an arrest warrant nor a search warrant was used in connection with the search of the Williams premises, and since it is clear that consent was not given, the search and the seizure must be justified, if at all, as one incident to a lawful arrest.

The Government claims that the agents were authorized to arrest Williams without a warrant, pursuant to 26 U.S.C. 7607, which reads in part as follows:

" * * * agents, of the Bureau of Narcotics of the Department of the Treasury * * * may * * * make arrests without warrant for violations of any law of the United States relating to narcotic drugs * * * where such person has reasonable grounds [1] to believe that the person to be arrested has committed or is committing such violation."

The Government contends that Wilhelmina Adams was a "reliable informant" within the meaning of Draper v. United States, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959) so that the agents would have had reasonable grounds to believe that Williams was guilty of criminal activity. Unlike the informer in the Draper case, however, Miss Adams had never supplied the Government with information concerning offenders other than defendant and, hence, the Government had no opportunity to verify her reliability as to such other offenders. Instead, the Government relies on the fact that information given by Miss Adams concerning defendant Williams

was corroborated in that her statements as to his address, apartment number, and operating procedure proved correct.

Before Williams opened the door the agents did not know whether he was in the apartment. If the agents had probable cause to arrest Williams, it was not until that instant. Even after seeing Williams at the door, Agent Kreppein had no way of knowing whether anyone else was in the apartment with Williams, other than the suspected customer who had not yet left. Thus, the agents did not know whether it was Williams or others who were receiving the customers.[2] However, when Williams did answer the door, and when Agent Kreppein recognized him,[3] after all of the other details that Miss Adams had revealed, it was as though the pieces of the jigsaw puzzle had dropped into place. No reasonable man would in the place of Agent Kreppein have been, at the instant before defendant Williams opened the door, without the suspicion that Williams was then and there in the very act of selling narcotics to the last visitor to the apartment. Agent Kreppein had certainly done nothing unlawful by ringing the door chimes, thereby causing Williams to expose himself and to supply the last interlocking piece of information to complete the combination of facts giving rise to "probable cause."

The act of ringing the chimes was not equivalent to the proverbial knock on the door in the middle of the night, characteristic of police tactics in a totalitarian society. It was, rather, a case of the Government agents taking advantage of the method of operation used by the defendant to conduct his unlawful business, and certainly no more objectionable than the use of many other

1. It has been held that the "reasonable grounds" test is substantially the same as the "probable cause" requirement of the Fourth Amendment to the United States Constitution. Draper v. United States, 358 U.S. 307, 310, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959).

2. Cf. United States v. Johnson, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948). That case is distinguishable because there

the agents had no specific information concerning the defendant before her arrest.

3. There is no explicit testimony by Agent Kreppein that he did in fact recognize Williams. However, he did testify that he had shown a picture of Williams to Wilhelmina Adams the same day and that upon Williams opening the door he addressed Williams by name.

kinds of ruses [4] employed by law enforcement officers to apprehend criminals engaged in activities of a furtive nature. The court, therefore, holds that Agent Kreppein had, the instant the door was opened, "probable cause" to arrest Williams for the violation of the narcotics laws.

II

The legal inquiry as to the validity of the subsequent search and seizure cannot, however, rest with the holding that "probable cause" existed. Were the case of Trupiano v. United States, 334 U.S. 699, 68 S.Ct. 1229, 92 L.Ed. 1663 (1948) and its progeny [5] still the law of the land, they would present an imposing obstacle to a finding that the search was lawful. Trupiano laid down the rule that a search, otherwise lawful, was rendered unlawful if the enforcement officers had a reasonable opportunity to obtain a search warrant but did not. It might have been argued (but was not) in this case that Agent Kreppein knew, or at least had strong reason to believe, as early as October 10, more than two months before the search, that the premises at 141 West 116 Street were being used for the unlawful sale of narcotic drugs. The argument might continue to the effect that even if that were not the case, the agents could have obtained a search warrant on the strength of statements made by Wilhelmina Adams, and certainly could have done so after they had confirmed her information as to the *modus operandi*. Finally, the argument would conclude by pointing out that not only was Apartment 2-E a fixed object (unlike the automobile search in Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925)) but also that, according to the statement of Wilhelmina Adams, Williams regularly sold narcotics every night from "dusk to dawn" and, hence, there were no exigent circumstances to justify an immediate search as there was in the Carroll case. The only fallacy in the foregoing argument is, of course, that its major premise, namely, that Trupiano still states the law of the land is false. In the case of United States v. Rabinowitz, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653 (1950), Trupiano, to the extent that it laid down an absolute rule requiring police officers to obtain a search warrant when possible, was explicitly overruled. In its place was substituted the following rule enunciated at page 66 of 339 U.S., page 435 of 70 S.Ct. of the Rabinowitz opinion:

> "The relevant test is not whether it is reasonable to procure a search warrant, but whether the search was reasonable. That criterion in turn depends on the facts and circumstances—the total atmosphere of the case. It is a sufficient precaution that law officers must justify their conduct before courts which have always been, and must be, jealous of the individual's right of privacy within the broad sweep of the Fourth Amendment."

Were it not for the Rabinowitz case, this court would be compelled to hold that the search of the Williams premises was unlawful, particularly in view of the decision of the Supreme Court in McDonald v. United States, 335 U.S. 451, 69 S.Ct. 191, 93 L.Ed. 153 (1948) which is indistinguishable from the case at bar.[6]

4. See United States v. Santore, 290 F.2d 51, 66 (2 Cir.1960) cert. denied, 365 U.S. 834, 835, 81 S.Ct. 745, 5 L.Ed.2d 743 (1961) (four separate orders).

5. See for example United States v. Johnson, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948); McDonald v. United States, 335 U.S. 451, 69 S.Ct. 191, 93 L.Ed. 153 (1948).

6. In McDonald federal agents had broken into a rooming house and had been able to observe the defendant engaged in criminal activities through a transom above his door. One of the agents knocked on the door and demanded to be let in. The defendant opened the door and was thereupon arrested and his paraphernalia seized. The principal opinion of the court held that despite the fact that the defendant did not have standing to raise the issue of unlawful entry into the house because such entry was through the room of another, the search, nevertheless, was unlawful because the agents had had an opportunity to procure a warrant. (See, however, footnote 7 infra.)

While McDonald has never been explicitly overruled by the Supreme Court, its holding was squarely based on the doctrine that Rabinowitz unequivocally overruled.[7] Despite the fact that the Trupiano test is no longer an absolute one, the quoted language of Rabinowitz still requires this court to take this factor into consideration in evaluating "the total atmosphere of the case,"[8] and in taking this factor into consideration the court must also recognize that there was a substantial element of exigency in the situation presented to the agents immediately before the entry into the apartment. The agents had every reason to believe that an unlawful sale was being consummated at that moment. Furthermore, although there was no testimony to that effect, the court cannot close its eyes to the common-sense notion that narcotic evidence, often being small in size, can easily be disposed of, and that persons engaged in the narcotics traffic would have a natural propensity to do so. Furthermore, for all that the agents knew at the time, Williams might have discontinued his activities at Apartment 2–E, especially in view of the fact that one of his customers, Wilhelmina Adams, had been apprehended that day.

The fact remains that the agents, without a warrant of any kind, and without the consent of the occupant, broke into a dwelling in the nighttime. In Jones v. United States, 357 U.S. 493, 499–500, 78 S.Ct. 1253, 1257, 2 L.Ed.2d 1514 (1958), the same question presented in the instant case was rhetorically posed as follows:

" * * * These contentions, if open to the Government here, would confront us with a grave constitutional question, namely, whether the forceful nighttime entry into a dwelling to arrest a person reasonably believed within, upon probable cause that he had committed a felony, under circumstances where no reason appears why an arrest warrant could not have been sought, is consistent with the Fourth Amendment. * * *"

The court did not answer that question because it found that the agents had entered the premises involved in that case in order to carry out a search rather than in order to make an arrest. However, in the opinion of this court, the recent case of Ker v. California, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726, supplies the answer. In the Ker case, California state officers, using a passkey supplied by the management, surreptitiously entered an apartment in the nighttime occupied by its tenants, a man and wife, who were then arrested for possession of marijuana, a block of which was in plain sight in the apartment. In the principal opinion of the Supreme Court, the seizure of the marijuana was held justified as incidental to a lawful arrest, and the arrest was held lawful as one founded on "probable cause," despite the fact that the apartment was entered in the manner described.

While it is true that there was no breaking of a door or lock in the Ker case, the view of this court is that the method used in the instant case was no more objectionable. Indeed, an argument can be made that entering a dwelling at night without informing the occupants is more unreasonable and more conducive to violence than what the agents did in the instant case. In accordance with the Ker case, this court

7. The ruling in McDonald has been distinguished on the basis that one of the Justices concurred in the result solely on the ground that the entry into the rooming house was unlawful. Burks v. United States, 287 F.2d 117, 124, 125 (9th Cir.1961) cert. denied 369 U.S. 841, 82 S.Ct. 868, 7 L.Ed.2d 846 (1962).

8. A Trupiano-like doctrine was relied upon by the Supreme Court in the case of Chapman v. United States, 365 U.S. 610, 81 S.Ct. 776, 5 L.Ed.2d 828 (1961), where, however, there was no arrest because no one was in the premises at the time of the search. Unlike the dissenters in Chapman, this court does not see in that decision a revival of the absolute doctrine of the Trupiano case.

holds that the constitutional rights [9] of the defendant Williams were not violated by the seizure of narcotics in his apartment on the evening of September 17, 1962.

### III

■ Although this court has held that the search of the Williams apartment was not unconstitutional, again it must be stated that the legal inquiry is not at an end. As pointed out in the Ker decision:

" * * * it must be recognized that the 'principles governing the admissibility of evidence in federal criminal trials have not been restricted * * * to those derived solely from the Constitution. In the exercise of its supervisory authority over the administration of criminal justice in the federal courts * * * this Court has * * * formulated rules of evidence to be applied in federal criminal prosecutions.' McNabb v. United States, 318 U.S. 332, 341, 63 S.Ct. 608, 613, 87 L.Ed. 819 (1943); cf. Miller v. United States, 357 U.S. 301, 78 S.Ct. 1190, 2 L.Ed. 2d 1332 (1958); Nardone v. United States, 302 U.S. 379, 58 S.Ct. 275,

82 L.Ed. 314 (1937)." (374 U.S. page 31, 83 S.Ct. page 1628.)

Of the cases cited for this proposition in Ker, Miller v. United States, 357 U.S. 301, 78 S.Ct. 1190, 2 L.Ed.2d 1332 (1958), is the only one dealing with searches and seizures. It held that a search in the District of Columbia was unlawful because of the violation of a statute [10] requiring officers to announce their "authority and purpose" before breaking into a dwelling in the execution of a search warrant. The court implied, 357 U.S. at page 306, 78 S.Ct. at page 1194, that the same requirement would apply within and without the District where the search was made incident to an arrest justified by "probable cause." Assuming that the requirement applies in this case,[11] the court is of the opinion that it was complied with when Agent Kreppein told Williams that he was a narcotics agent who was there to arrest him for violation of the narcotics laws. Furthermore, if 18 U.S.C. § 3109 is fully applicable in this case (as implied by the Miller case [12]), the entry was fully authorized by that section, and thus, aside from constitutional considerations,

9. Eight Justices joined in Part I of the principal opinion of the court in the Ker case, holding that violation of federal constitutional standards as to searches and seizures, derived from the provisions of the Fourth Amendment, required suppression of evidence obtained thereby in the State Courts. However, only four of those eight Justices joined in the balance of that opinion, which held that such standards were not violated. The other four Justices who concurred in Part I dissented from the rest of the principal opinion and from the result on the ground that the Fourth Amendment had been violated. The ninth Justice concurred in the result solely on the ground that Fourth Amendment standards should not be applied to the states and expressed no opinion as to whether the search met such test. Thus, only four of the nine Justices found that the search was not unconstitutional. Nevertheless, this court is of the opinion that it is constrained to follow this latest pronouncement of the Supreme Court in this area of the law, as expressed in the principal opinion.

10. 18 U.S.C. § 3109, which reads as follows: "The officer [authorized to search in the warrant or otherwise so authorized by law] may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance or when necessary to liberate himself or a person aiding him in the execution of the warrant."

11. The Supreme Court remarked in footnote 4 at page 305 of 357 U.S., page 1193 of 78 S.Ct. in the Miller decision that federal narcotics officers were subsequently given authority to make arrests by 26 U.S.C. § 7607. It does not appear, however, that that statute would eliminate the requirement set forth in 18 U.S.C. § 3109.

12. The breaking into in the instant case was similar to that in the Miller case in that in both cases the door chain-latch was broken under like circumstances.

the manner of making entry was lawful within the above-quoted dictum from page 31 of 374 U.S. and page 1628 of 83 S.Ct. of the Ker case. In any event, defendant has cited no authority (nor has this court found any through its own research) to the effect that the seizure in the Williams apartment violated any applicable federal norms. Accordingly, and for the other reasons stated above, the motion made by defendant Williams is denied.

## IV

The motion made by the defendant Henry Watson is also without merit. While it is true that Williams had not informed as to other offenders prior to the time he informed as to Watson, under all the circumstances of the case, in the opinion of this court, Agent Heer had "reasonable grounds to believe that the person to be arrested * * * [was] committing such [narcotics] violation." Unlike the informer in the case of Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963) (preliminary print No. 3), Williams had confessed and was obviously attempting to curry favor with his captors. It would be ignoring reality to suppose that Williams would have deliberately misled the agents who could and did verify his statement in a relatively short time after it was given. Moreover, that information was at least partially corroborated by the facts that the agents had observed, namely, the operation of an active narcotics sales business in the apartment, and the further fact that only ten packs of the drug were left at the time of the initial search.

Defendant Watson cites McDonald v. United States, 335 U.S. 451, 69 S.Ct. 191, 93 L.Ed. 153 (1948) for the proposition that a guest in an apartment may raise the question of unlawful search of that apartment where such apartment belongs to another. Even assuming, however, that the search of the apartment was unlawful, Watson was not in the apartment before his arrest. He, therefore, has no standing to assert that the evidence (including the statement obtained from Williams [13]) was discovered in violation of his constitutional rights. Wong Sun v. United States, 371 U.S. 471, 492, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

Accordingly, the motion made by Watson is also denied.

So ordered.

---

13. See Wong Sun v. United States, 371 U.S. 471 at p. 485, 83 S.Ct. 407 at p. 416, et seq.