**UNITED STATES of America,**
**Appellee,**

v.

**Joel LOZAW, Appellant.**

**No. 653, Docket 33991.**

United States Court of Appeals,
Second Circuit.

Argued March 27, 1970.

Decided June 11, 1970.

---

Joel R. Brandes, Harold M. Weiner, Shapiro, Reibert & Brandes, New York City, for appellant.

Arthur J. Viviani, Asst. U. S. Atty. (Whitney North Seymour, Jr., U. S. Atty. for Southern Dist. of New York, David A. Luttinger, Asst. U. S. Atty., of counsel), for appellee.

Before LUMBARD, Chief Judge, HAYS, Circuit Judge, and BLUMENFELD, District Judge.*

BLUMENFELD, District Judge:

This is an appeal from a judgment of conviction by verdict of the jury upon a two-count indictment which charged the defendant and five others with violations of the federal narcotics law, 21 U.S.C. § 176a. One count charges the substantive offense of knowingly concealing marihuana; the other, conspiring to do the same. Four of appellant's co-defendants pleaded guilty to the conspiracy count [1] before trial. Only the appellant was tried to the jury. He was sentenced to the mandatory minimum term of five years imprisonment on each count, the sentences to run concurrently.

There are several grounds of appeal. First, appellant contends that the evidence seized at his apartment should be suppressed because (1) the search of his apartment was not incident to a lawful arrest and (2) even if the arrest was lawful, the search went beyond its permissible scope. Appellant's second assignment of error is that the evidence was insufficient to support the jury's verdict on the conspiracy count. Thirdly, Lozaw contends on several grounds that the charge was improper. Finally, he claims that the imposition of a sentence with no possibility of parole constituted cruel and unusual punishment in violation of the eighth amendment. We find no error, and affirm the judgment.

## I. *The Facts*

Viewing the evidence in the light most favorable to the government, Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942), as we are required to do, United States v. Andreadis, 366 F.2d 423, 428 (2d Cir. 1966), cert. denied, 385 U.S. 1001, 87 S.Ct. 703, 17 L.Ed.2d 541 (1967), the jury could have found the following facts. During the afternoon of July 24, 1968, a person not named introduced John B. Lepore, an agent of the federal Bureau of Narcotics, to defendant Octavio Mestre (also known as Toto) at the latter's apartment at 123 East 38th Street, New York City. Mestre gave the agent a phone number and spoke with him about the purchase of marihuana. On or about July 29, Lepore, acting as an undercover agent, called the number, but finding it was disconnected, went to Mestre's apartment accompanied by another agent, Frank Ioppolo. The agents met Mestre and set up an appointment for August 5th to buy marihuana. On that date they returned to the apartment, and met one Juan Bernal, who explained that Mestre was not there, but would be back soon. He gave the agents the unlisted telephone number of the apartment, and requested them to call later that evening.

Agent Lepore telephoned Mestre's apartment at about 10:00 p. m. Carlos Garcia, a youth subsequently identified as the third defendant, answered, saying that Mestre had arrived at the airport with the "stuff" and that Lepore should telephone again in a half hour. When Lepore telephoned again at about 10:30 p. m. Mestre himself answered. The two then arranged to meet later at Mestre's apartment between 2:00 and 6:00 a. m. of August 6, 1968. Mestre cautioned Agent Lepore not to arrive later than 6:00 a. m. since no marihuana would be left.

At approximately 2:00 a. m., Agents Lepore and Ioppolo arrived at Mestre's apartment and were admitted by the fourth defendant, Jose Miguel Ruiz. Mestre, accompanied by Bernal, arrived about a half hour later and said they had the marihuana. A price of $4800 was set for 28 kilograms. After Bernal made a phone call "to the village," he

---

* Of the District of Connecticut, sitting by designation.

1. The fifth co-defendant pleaded guilty to a violation of 26 U.S.C. §§ 4744(a) and 7237(a) (acquiring marihuana without paying the transfer tax). All five were sentenced as youthful offenders under 18 U.S.C. § 5010(b).

asked Agent Lepore to show him the money. Satisfied, Bernal, Mestre and the two agents drove to Greenwich Village, taking with them an empty suitcase furnished by Mestre for use in transporting the marihuana. They were followed by other agents of the federal Bureau of Narcotics, who were conducting surveillance.

They parked in front of an apartment house at 72 Barrow Street. Mestre, followed by surveilling Agent Dennis Raugh, carried the empty suitcase into the building and took the elevator to the fourth floor. Agent Raugh walked up the stairs to the fourth floor, and waited in the staircase. A few minutes later, Bernal also entered the building, and Agent Raugh saw him enter apartment 4Q. Shortly thereafter, Bernal and Mestre together emerged from apartment 4Q carrying the suitcase, which now appeared to be heavy. One of them (Agent Raugh could not tell which) said to someone remaining in the apartment, "We'll be back later for the rest of the stuff."

Bernal and Mestre returned to the automobile where Agents Lepore and Ioppolo were waiting. Lepore opened the suitcase to examine the contents. Bernal said, "Not here, not here * * *. [W]e still have over a hundred pounds of grass up in that apartment and I don't want the area to be heated up." Recognizing the contents as marihuana (28 kilograms of it, according to subsequent analysis), Lepore placed Bernal and Mestre under arrest.

Agent Raugh returned to the car and told Agents Lepore and Ioppolo of his observations. The three agents, accompanied by other agents who had been participating in the surveillance, thereupon went with Bernal and Mestre to apartment 4Q and knocked. A voice from within asked, "Who's there?" and Mestre in compliance with instructions from the agents replied, "It's Toto."

Lozaw opened the door. The agents identified themselves and placed him under arrest. A search of the apartment disclosed approximately 36 additional kilograms of marihuana. Some of it was in brick form wrapped in Spanish-language newspapers published in Colombia, South America, inside an open suitcase resting on top of the commode in the bathroom; some of it was loose in the bathtub; and the rest was contained in 30 to 35 paper bags full on the floor of the living room. Also in the apartment were two youths, the defendants Carlos Garcia and Jose Antonio Ruiz, whom the agents arrested. Lozaw was the lessee of apartment 4Q and had lived there 4½ years.

## II. *Legality of the Arrest*

The defendant contends that his arrest without a warrant was illegal for lack of probable cause, and consequently that the search and seizure which ensued were unlawful, requiring suppression of the evidence thus obtained. The first question is whether or not the agents had reasonable grounds [2] to believe that Lozaw had violated or was violating the federal narcotics law. In Draper v. United States, 358 U.S. 307, 310, 79 S.Ct. 329, 331, 3 L.Ed.2d 327 n. 3 (1959), the Supreme Court said: "'[P]robable cause' as used in the Fourth Amendment and 'reasonable grounds' as used in [26 U.S.C. § 7607] are substantial equivalents of the same meaning." When the arrest was made, the agents were not acting on the basis of bare suspicion. From what they had observed and overheard they knew at first hand that a narcotics felony had been committed in the apartment a few moments before. See United States ex rel. McCullers v. McMann, 370 F.2d 757 (2d Cir. 1967); cf. Draper v. United States, *supra*, 358 U.S. at 313–14, 79 S.Ct. 329, 3 L.Ed.2d 327. There were reasonable grounds for the agents to think that more marihuana was being

---

2. A federal narcotics agent is authorized to make an arrest without a warrant where he has "reasonable grounds to believe that the person to be arrested has committed or is committing" a violation of the narcotics law. 26 U.S.C. § 7607(2).

concealed in the apartment, that its transportation was being facilitated there, and that by 6:00 a. m. "no marihuana would be left." Even without Bernal's spontaneous protest when the suitcase was opened [3] this is a much stronger case of reasonable grounds to arrest than in United States v. Thompson, 356 F.2d 216 (2d Cir. 1965), cert. denied, 384 U.S. 964, 86 S.Ct. 1591, 16 L.Ed.2d 675 (1966) or United States v. Monticallos, 349 F.2d 80 (2d Cir. 1965). See United States ex rel. Boucher v. Reincke, 341 F.2d 977 (2d Cir. 1965).

■ Lozaw's contention that the entry, although peaceable, was unlawful because the agents used Mestre to induce the appellant to open the door, is not sustainable in view of United States v. Williams, 219 F.Supp. 666 (S.D.N.Y. 1963), aff'd per curiam, 336 F.2d 183 (2d Cir.), cert. denied, 379 U.S. 857, 85 S.Ct. 112, 13 L.Ed.2d 60 (1964). See also, United States v. St. Clair, 240 F. Supp. 338, 340–41 (S.D.N.Y.1965). Nor does the fact that the agents did not know Lozaw's identity before the arrest invalidate it. United States v. Llanes, 398 F.2d 880, 883 (2d Cir. 1968), cert. denied, 393 U.S. 1032, 89 S.Ct. 647, 21 L.Ed.2d 576 (1969).

### III. *Legality of the Search*

■ As the arrest was lawful, so was the search incident to it. Ker v. California, 374 U.S. 23, 41, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963). The scope of the search was within permissible limits. This was not a case of a probing, exhaustive search of the rooms, although Lozaw was the lessee and controlled possession of the entire apartment. All of the marihuana seized was in plain sight as the agents arrested the other occupants who were possible confederates. This search took place prior to Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), which does not apply retrospectively. United States v. Mazzochi, 424 F.2d 49 (2d Cir. 1970); United States v. Bennett, 415 F. 2d 1113 (2d Cir. 1969). We are satisfied that there was no error in Judge Bonsal's denial of the pre-trial motion to suppress or in Judge Cooper's admission of the evidence gained through the search and seizure.

### IV. *Sufficiency of the Evidence*

Considering the short history of the direct and rapid progress of a sizeable transaction for the purchase of a bulk quantity of marihuana which had been picked up at Lozaw's apartment by "Toto" and Bernal, Lozaw's presence in his own apartment only a few minutes later when he opened the door in response to Mestre's identification of himself as "Toto," and the fact that marihuana was being repackaged at that time in his apartment, it borders on the frivolous to contend there was not enough evidence of his participation in the conspiracy to go before the jury. Cf. United States v. Geaney, 417 F.2d 1116 (2d Cir. 1969); United States v. Ragland, *supra*, 375 F. 2d 471. The evidence of the acts of his co-conspirators, "verbal" or otherwise, noted above, were properly before the jury. See United States v. Calarco, 424 F.2d 657 (2d Cir. 1970); United States

---

3. Bernal's statement that "* * * [W]e still have over a hundred pounds of grass up in that apartment and I don't want the area heated up," as is obvious from its context, was made before he was placed under arrest. There is no merit to the appellant's double-barreled argument that out of court statements by a co-conspirator in furtherance of the conspiracy cannot be used against him in evidence and, therefore, cannot be considered as reasonable grounds for his arrest. Cf. United States v. Ragland, 375 F.2d 471, 476–477 (2d Cir. 1967), cert. denied, 390 U.S.

925, 88 S.Ct. 860, 19 L.Ed.2d 987 (1968). Even if Bernal had not been a co-conspirator, it was clear that he spoke from personal knowledge. See United States v. Soyka, 394 F.2d 443, 452–454 (2d Cir. 1968), cert. denied, 393 U.S. 1095, 89 S.Ct. 883, 21 L.Ed.2d 785 (1969) (opinion on rehearing *en banc*).

And the fact that Bernal had just gone into the apartment with an empty suitcase and brought it back containing a large quantity of marihuana provided reliability to the information.

v. Nuccio, 373 F.2d 168, 173–174 (2d Cir), cert. denied, 387 U.S. 906, 87 S.Ct. 1688, 18 L.Ed.2d 623 (1967).

### V. *The Conduct of the Judge*

■ The trial judge specifically instructed the jury as to each element of the crimes charged and that the burden was on the government to prove each beyond a reasonable doubt before a guilty verdict could be returned. In the face of the positive instruction that the government must prove "that the marihuana was unlawfully imported and the defendant knew this to be so," refusal to also give the same instruction in the negative form, that if the jury found there was insufficient evidence to establish beyond a reasonable doubt the importation of the marihuana the defendant must be acquitted, was not error. See Byas v. United States, 86 U.S.App. D.C. 309, 182 F.2d 94, 96 (D.C.Cir. 1950).

■ In connection with this same issue, the defendant assigns error in the failure of the judge to charge that it was scientifically impossible to distinguish between imported and domestic marihuana. Not only was no exception taken, but in addition no evidence to support that contention was offered. This claim of error is without merit.

■ The defendant also complains of the failure of the trial judge to clarify the naming of the defendant in the indictment as Joel Lozaw, "a/k/a Piloto," to mean that Piloto was actually Lozaw's middle name and that Spanish-speaking people frequently use both their mother and father's family names. However, the record discloses that when defense counsel objected to this challenged omission at trial, he informed the judge that Lozaw had testified, in response to defense counsel's own question, that his middle name was Piloto. On the basis of that representation, and the fact that nothing had been made of this matter either in the summations or the charge, Judge Cooper denied the request to further instruct the jury. Whatever "aura of an alias" survived in such a context "would not in our judgment even remotely tend to justify a reversal." United States v. Grayson, 166 F.2d 863, 867 (2d Cir. 1948). See United States v. Miller, 381 F.2d 529, 536 (2d Cir. 1967), cert. denied, 392 U.S. 929, 88 S. Ct. 2273, 20 L.Ed.2d 1387, rehearing denied, 393 U.S. 902, 89 S.Ct. 66, 21 L.Ed. 2d 188 (1968).

Although no exception or objection was taken below, the defendant argues before us that not only was it error to explain to the jury that the distinct crime of conspiracy sometimes is more dangerous to the public than commission of the substantive offense itself, as noted in United States v. Rabinowich, 238 U.S. 78, 88, 35 S.Ct. 682, 59 L.Ed. 1211 (1915), but also that this alleged error was compounded by the use of a descriptive example of how a conspiracy works. After a suggestion that the jurors knew "from your reading, as you have seen in television, as you have heard from other sources, in a conspiracy there is usually a leader at the top who says very few words" the judge gave a scenarist's account of the operation of a conspiracy, with a cast which included a "top banana," a "muscleman," a "runner," and other colorful characters.

■ We endorse the view that instructions to a jury in the applicable law ought not be conveyed merely in boilerplate abstractions, but rather, that they should be adapted to the case in language the jury may more readily understand. See Quercia v. United States, 289 U.S. 466, 469, 53 S.Ct. 698, 77 L.Ed. 1321 (1933). This was so adequately done by Judge Cooper that the additional dramatized example of how conspirators talk and act was superfluous and "might better have gone unsaid." United States v. Birnbaum, 337 F.2d 490, 498 (2d Cir. 1964). The exercise of stylistic caution and verbal restraint would have made it unnecessary to consider whether there was a risk that the jury might have been tempted to decide issues on extraneous standards instead of legal ones.

Even without the judge's telling the jurors that the characters, dialogue and plot were factually unrelated to the case under consideration, they could not have thought otherwise. This extemporaneous synopsis was concluded with the instruction that it was for the jury to decide whether there was a conspiracy and whether the defendant was a member of it. It was clear to the jury, not alone from this, but from an examination of the charge as a whole, that all matters of fact had been submitted to their determination. See Quercia v. United States, *supra*, 289 U.S. at 469, 53 S.Ct. 698, 77 L.Ed. 1321.

We have considered the defendant's other claims of error in the charge and find them without merit.

## VI. *The Sentence*

■ The final argument of the defendant for a remand is that a sentence for violation of 21 U.S.C. § 176a amounts to cruel and unusual punishment in violation of the eighth amendment. We agree with other courts which have rejected this argument. United States v. Drotar, 416 F.2d 914 (5th Cir. 1969); Bettis v. United States, 408 F.2d 563 (9th Cir. 1969); United States v. Ward, 387 F.2d 843 (7th Cir. 1967). We also reject the contention that the mandate of 26 U.S.C. § 7237(d) prohibiting probation or suspension of a sentence for a § 176a violation amounts to cruel and unusual punishment.[4] United States v. Drotar, *supra*, 416 F.2d at 917; Stewart v. United States, 325 F.2d 745 (8th Cir.), cert. denied, 377 U.S. 937, 84 S.Ct. 1344, 12 L.Ed.2d 301 (1964).

The judgment of conviction is affirmed.

LUMBARD, Chief Judge, with whom HAYS, Circuit Judge, joins (concurring).

While I concur in all that Judge Blumenfeld has written for the court, I think it needs to be said that, even were

the principles of Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed. 2d 685 (1969) to be applied, the search of Lozaw's apartment and the seizure of the marihuana was a reasonable and lawful consequence of a lawful arrest. More than that, under all the circumstances which culminated in Lozaw's arrest, it was the clear duty of the agents to make the arrest and seizure immediately, without a search warrant, and with the least possible delay.

It was shortly after 2:00 A.M. when Bernal and Mestre walked out of apartment 4Q at 72 Barrow Street, in Greenwich Village, with a heavy suitcase. Narcotic Agents saw this and heard one of them say to someone in the apartment "We'll be back later for the rest of the stuff." They brought the suitcase down to where Agents Lepore and Ioppolo were waiting for them in a parked car. When Lepore opened the suitcase, Bernal said "Not here, not here * * * [we] still have over a hundred pounds of grass up in that apartment and I don't want the area to be heated up." Knowing that the contents of the bag was marihuana—something over 60 pounds —Agent Lepore then arrested Bernal and Mestre.

At the same time Agent Raugh returned to the car from his observation post in the apartment house and told Lepore and Ioppolo what he had seen and heard. Previously at 10:30 P.M. when Lepore telephoned Mestre's apartment at 123 East 38th Street, Mestre had told Lepore to meet him at the 38th Street apartment a few hours later between 2:00 and 6:00 A.M., but not later than 6:00 A.M. as no marihuana would be left. Consequently Lepore and Ioppolo went to Mestre's apartment at 2:00 A.M. and, after showing Mestre that they had the $4,800 agreed upon as the price for the 28 kilograms, Mestre and the two agents drove down to Greenwich Village.

Thus by the time the agents had arrested Mestre and Bernal they knew that other persons in apartment 4Q were

---

4. 18 U.S.C. § 4202 (Supp. II 1968) now provides for parole.

in possession of a large quantity of marihuana which they expected to dispose of in the next three or four hours.

As Judge Blumenfeld has pointed out, there was ample probable cause for Lozaw's arrest when he opened the door of apartment 4Q. To use the words of Mr. Justice Stewart's opinion in *Chimel*, at page 759, 89 S.Ct. at 2038, quoting Mr. Justice Murphy in Trupiano v. United States, 334 U.S. 699, 708, 68 S.Ct. 1229, 1234, 92 L.Ed. 1663 (1948), "the inherent necessities of the situation at the time of arrest" required an immediate search of the apartment 4Q for the marihuana still there. Marihuana was found in an open suitcase on the top of a commode in the bathroom, in the bathtub and in paper bags on the floor in the living room.

While it is true that the search conducted by the agents went beyond "the area from within which he might have obtained either a weapon or something that could have been used as evidence against him," *Chimel, supra,* at page 768, 89 S.Ct. at 2043, it is also true that the search of the apartment had to be made immediately if the remaining marihuana was to be found. The agents could not know how many others were involved in the distribution of the marihuana; it could have been many more than the five men they had seen—Mestre, Bernal, Lozaw and two other men in the apartment whom they also arrested. Any extended delay would increase the risk of danger to the officers from others who would soon be aware of what had happened and the risk that others would find some means of making away with the marihuana. It would have taken the agents at least 10 hours, and probably somewhat longer, before they could have obtained a warrant and gotten it back to Barrow Street for execution.

Search warrants are not obtainable on short notice, particularly at 2 or 3 o'clock in the morning. Even during business hours and under the most favorable circumstances, with an Assistant United States Attorney available, a stenographer ready and the United States Commissioner at hand, and with no lunch hour or other matters intervening, four or five hours would go by before the two agents necessary to establish probable cause could return to Barrow Street with a search warrant. Assuming staff to be available by 9:00 A.M., it would have been sometime between 1:00 and 2:00 P.M. before the search could have proceeded under a warrant.

I cannot believe that anything written in the prevailing opinion in *Chimel* could be interpreted to require law officers to obtain a search warrant before searching an apartment which they knew was then and there being used for unlawful possession and sale of narcotics.

In *Chimel* the officers had secured an arrest warrant and they obviously had the same ample time to secure a search warrant. Here the facts which gave the agents probable cause to arrest Lozaw were not known to them until immediately before they had to act and arrest Lozaw. This was not a routine search incidental to an arrest. See generally American Law Institute, Model Code of Pre-Arraignment Procedure, Tentative Draft No. 3 (April 24, 1970), Article 3.

For these reasons I would hold the search to be lawful even if the principles in *Chimel* were applied. Arrests and seizures in narcotics cases are frequently required under circumstances very similar to those which faced the officers here on the night of August 5 and 6, 1968. It would be most unfortunate if anything said in our opinion would lead to the belief that action similar to that so effectively taken here might be unlawful.