UNITED STATES of America, Appellee,

v.

Fathi ASSI, a/k/a "Karlet," and Judith Charres, Defendants-Appellants.

Nos. 1628, 1687, Dockets 84–1206, 84–1207.

United States Court of Appeals, Second Circuit.

Argued Aug. 6, 1984.

Decided Oct. 17, 1984.

Thomas E. Moseley, New York City (Benito Romano, Asst. U.S. Atty., Rudolph W. Giuliani, U.S. Atty., S.D.N.Y., New York City, of counsel), for appellee U.S.

Harry C. Batchelder, Jr., New York City, for appellant Fathi Assi.

Victor J. Herwitz, New York City, for appellant Judith Charres.

Before VAN GRAAFEILAND and WINTER, Circuit Judges, and BARTELS, District Judge.[*]

WINTER, Circuit Judge:

Appellants Fathi Assi and Judith Charres appeal from convictions before Judge Cooper by a jury in the Southern District of New York of conspiracy to commit, 18 U.S.C. § 371, aiding and abetting in, 18 U.S.C. § 2, and the commission of, the substantive crimes of making false statements to the Immigration and Naturalization Service ("INS"), 18 U.S.C. § 1001, obstruction of justice, 18 U.S.C. § 1505 and visa fraud, 18 U.S.C. § 1546.

We reverse.

### BACKGROUND

The appellants' convictions stem from their association with Magdi El-Gendi, a student alien at Fairleigh-Dickinson University and Norma Iris Martinez, a United States citizen. On December 17, 1981, El-Gendi and Martinez entered into a sham marriage to secure him permanent resident alien status. Assi and Charres witnessed the marriage ceremony and signed the marriage certificate. In January, 1982 El-Gendi and Martinez submitted several false documents to the INS in seeking permanent alien resident status for El-Gendi. The marriage and submission of documents are the basis for the criminal charges in this case.

Martinez later admitted to an INS investigator that the marriage was a sham. She thereafter entered a plea of guilty to one count of making a false statement to the INS and signed a cooperation agreement with the government. Her testimony for the government at Assi's and Charres' trial was the only evidence linking them to her sham marriage. According to Martinez, Charres asked her twice in November, 1981 whether she knew anyone willing to enter into a sham marriage to secure citizenship for an alien. On the second occasion, Martinez expressed interest in the proposition and asked how much she would be paid. Thereafter Charres introduced Martinez to Assi, a Palestinian refugee and student with permanent resident alien status. He then introduced Martinez to his friend and fellow student, El-Gendi. Martinez stated that Assi offered her $500 to marry El-Gendi.

On December 17, 1981, Martinez and El-Gendi were married with Assi and Charres as witnesses. Martinez testified that Assi in the presence of Charres handed her $200 and promised her $300 when El-Gendi received his green card. On January 20, 1982 Martinez and El-Gendi submitted documents to the INS falsely representing that they were living together as husband and wife. Martinez further testified that Assi and Charres had coached her as to how to respond to any INS inquiries about the legitimacy of the marriage. Since Charres had left New York on January 5, 1982 to live in Puerto Rico, this alleged conversation must have occurred before that date.

Martinez also testified, over defense objection, that on August 10, 1983, after she had confessed to the INS investigator, she and a companion, Antonio Ramirez, were abducted by a group of "Arabs" in a car she identified as Assi's. She was held overnight and told to deny her statement to the INS. Subsequently, "several Chinese" took her to a court proceeding instituted to

---

[*] The Hon. John R. Bartels, Senior United States District Judge for the Eastern District of New York, sitting by designation.

block El-Gendi's deportation, where Martinez denied before Judge Lowe that she had entered into a sham marriage. The following day, August 12th, Martinez swore that her testimony the day before was false. Despite the fact that the government had stipulated that neither Assi, who was in Jordan at the time, nor Charres, who had left the country over one and one-half years before, were in any way connected with the abductors, Martinez was allowed to explain her perjury in the deportation proceeding by describing the abduction.

Ramirez was also allowed to corroborate Martinez's story of the abduction but stated further that Assi had been at the scene. Since Assi was in Jordan at the time of the incident, the government then had to impeach Ramirez's testimony. In view of the fact that appellants were in no way connected with the abduction, the district court gave a limiting instruction directing the jury to consider the evidence relating to the abduction "solely to establish (Martinez's) state of mind" at the deportation proceeding.

During her testimony, Martinez was impeached by a showing of prior convictions for shoplifting and criminal trespass. She also admitted to falsifying welfare applications.

Charres and Assi testified in their own defense and essentially denied all of Martinez's allegations of complicity in the fraudulent marriage.

On the third day of trial, the jury returned a verdict of guilty on all counts against Assi and Charres.[1] We reverse because of errors in the charge to the jury.

## DISCUSSION

First, the very length of the charge, two hours and forty minutes, warrants concern in this three-day case, which involved only an issue of credibility. The purpose of jury instructions is to inform the jury clearly and succinctly of the role it is to play and the decisions it must make. We have previously recognized that "[r]epetitious and unnecessarily long charges are confusing to a jury," *United States v. Persico*, 349 F.2d 6, 8 (2d Cir.1965), and prevent it from grasping and applying the law to its clear and independent determination of the facts. *Bollenbach v. United States*, 326 U.S. 607, 612–13, 66 S.Ct. 402, 405, 90 L.Ed. 350 (1946). The charge here was repetitious and wandering. It was unduly lengthened by jingoistic descriptions of the American criminal justice and immigration system, digressions into personal history, and other extraneous matters, including an offer to examine the jurors as to how much law they had learned from the judge with a view to admitting them as members of the bar.[2] Appellants had a right to a succinct charge on the applicable law free of irrelevant and confusing digressions. Given the simplicity of the issue here, the charge given could only have confused and misled the jury.

Second, the charge contained specific error. For example, it included a "community impact" charge, which stated that a conviction would be a clear warning that such crimes will not be tolerated, a fact of which the public was entitled to be assured.[3] This instruction, which was not

---

1. El-Gendi was originally indicted with Assi and Charres; he pleaded guilty to the conspiracy count prior to trial. On May 22, 1984 he received a suspended sentence of nine months which reflected the time he had already served awaiting trial. Assi was sentenced to two years imprisonment on each count with the sentences to run concurrently, and denied bail pending appeal. Charres was sentenced to three years on each count, concurrently, with the imposition of sentence suspended and three years probation.

2. "By the time I get through, I may very well conduct an examination of each and every one of you, and upon finding that you are expert with respect to the law given to you, so repetitively by me, I will try to seek to admit you as members of the bar of this court ...." (J.A. 154).

3. "If you find the law has not been violated, you should not hesitate for any reason to return a verdict of not guilty. That would be your sworn obligation.
   On the other hand, if you find that the law has been violated as charged, you should not

requested by the government, was taken almost verbatim from *United States v. Terry*, 702 F.2d 299 (2d Cir.), *cert. denied*, 461 U.S. 961, 103 S.Ct. 2095, 77 L.Ed.2d 304, —— U.S. ——, 104 S.Ct. 482, 78 L.Ed.2d 680 (1983), a decision stating that such language serves no "useful purpose," *id.* at 313, but held it harmless in the circumstances of that case. The district judge also characterized the government as taking the position that the defendants had "spat" upon the privileges conferred by the immigration laws.[4] Such language would have been improper if used by government counsel, which it was not, and the trial judge should not have imputed it to the government.

The court also used inflammatory language in discussing enforcement of the immigration laws.[5] The statement that the immigration laws are "designed to avert a

mere handful who might under certain circumstances hold the country at bay" and his description of some illegal aliens as "elements, human but otherwise detrimental to the commonwealth" also serves no useful purpose and might be easily misunderstood by a jury. This risk was compounded by other comments upon the "undermanning" of the INS and consequent flow of illegal immigrants which he explicitly equated to the flow of drugs.

■ The charge also included prejudicial commentaries on the law of conspiracy, such as, for example, a reference to "the gruesome, irremediable, drastic horrifying effects of conspiratorial plans." Moreover, some of these comments may have left the impression that the defendants were members of a vast criminal syndicate which the government was beginning to unravel.[6]

hesitate because of sympathy or, for any other reason, to render a verdict of guilty, because in your concept of what is absolutely requisite here, that would be the justice of the case if you so decide.

And if that is your decision, it must also constitute a clear warning that a crime of this character may not be committed with impunity, and the public is entitled to be assured of this." (J.A. 193)

4. "It is the America, the land of opportunity with the outstretched hand welcoming. Everybody and anybody from all over the world under our law is entitled to come and have a share of its benefits. Once in a great while I sit in the naturalization part of this court. The last time there were 325. They came from 39 different countries in the world.

"Where is there another country in the world that would offer that opportunity to the weak, physically, to those seeking life and the blessings of liberty? And the point is, were these advantages so extreme, spat upon by these defendants, or do they do honor to the privileges conferred upon them? The government maintains the former, the defendant insists on the latter." (J.A. 133–34)

5. "This is a serious crime because the true administration of justice is the cornerstone of all our liberties. May I remind you what is self evident: That even though there are millions of people in this country, these enactments, these precautions, these steps are designed to avert a mere handful who might under certain circumstances hold the country at bay. So don't belittle the purpose. And the vitality of these proceedings and the law making them imperative. And you might also

know from a practical point of view that because most of the departments, just as with drugs coming into the country, are undermanned, the biggest problem is to deal with the influx of those elements, human but otherwise detrimental to the commonwealth, because of the lack of ability for full watchfulness." (J.A. 170)

6. "There are many conspiracies with hundreds of members of the conspiracy. You read in the papers right now going ·on in this very court, the first initial proceeding involving a group of racketeers, it is alleged, who imported $1.3 billion worth of drugs for distribution; alleged conspiracy . . . ."

"Collective criminal agreement, sometimes called a partnership in crime, presents a greater potential threat to the public than the lone wrongdoer.

In other words, it is easier to grab a hold of the single operator, but the government spends sometimes years in cracking the tentacles, deeply lodged and embedded after decades of uninterrupted conspiratorial activity. In some of the cases I have presided in, it has taken them six years to run down a lead in order to be able to get enough evidence to come within the demand of the law so as to prosecute beyond a reasonable doubt. That is the viciousness of a conspiracy. . . .

So hence, get this, you can have your formidable, outrageous, frightening combination with a big shot on top and his advisors right alongside of him, and the fellows in the middle carrying out a certain duty in connection with the development of the conspiracy, and at the bottom, a group of errand boys or men,

Resort to such commentary was specifically disapproved in *United States v. Lozaw*, 427 F.2d 911, 916 (2d Cir.1970) where there was powerful evidence of a hierarchical conspiracy. Here, however, there was no evidence whatsoever of a hierarchical conspiracy, and this rhetoric, amounting as it did to an implication unwarranted by the evidence, was error. Moreover, the instruction revived the very inference that the limiting instruction at trial relating to the abduction evidence was intended to suppress. Charges such as this, which significantly confuse the jury's consideration of evidence introduced for limited purposes have been repeatedly held erroneous. *United States v. Morales*, 577 F.2d 769, 773 (2d Cir.1978); *United States v. Araujo*, 539 F.2d 287, 289 (2d Cir.), *cert. denied*, 429 U.S. 983, 97 S.Ct. 498, 50 L.Ed.2d 593 (1976).

Additionally, the instructions on the credibility of accomplices and criminal defendants, an issue on which the entire case turned, were not balanced.[7] The judge's comments on the necessity of using accomplices in order to obtain "by far the greater number" of convictions invited the jury to infuse their consideration of Martinez's testimony with public concerns for law enforcement. With regard to Martinez, he suggested that truth, like courage, comes from "unlikely sources," and the colorful word play with "purge" and "perjury" was unduly suggestive. Similar instructions barely survived review in *Araujo*, 539 F.2d at 290, where we noted there that it would have been "much better to have avoided this instruction."

In contrast, the instructions with regard to the testimony of the appellants, given

carrying out a part of the totality of the conspiratorial purpose, each one is a member of that conspiracy if so proven, and each one is bound with what each and every other one does in his absence and without his knowledge in connection with furthering the objective of the conspiracy.

So that little guy at the bottom is going to be held responsible for the declaration made by the guy on top who has laid down a plan unknown to the little guy below, but it is in furtherance of the same objective of the same conspiracy of which that fellow below and the fellow on top were fully aware and committed to."

\* \* \* \* \* \*

"That's why the law is so firm and unbending because of the gruesome, irremediable, drastic horrifying effects of conspiratorial plans." (J.A. 134–56)

7. "The Government witness has testified that she was a participant in the crimes charged in the indictment. She is commonly referred to as an accomplice. The Government frequently must use such testimony because it must take the witnesses as it finds them and because otherwise, it would be difficult or impossible to detect or prosecute wrongdoers. If accomplices could not be used, there would be many cases, by far the greater number, where a guilty person could not be prosecuted and convictions would not be obtained.

The evidence of accomplices is thus properly considered by the jury. The testimony of an accomplice is not to be rejected unless the jury thinks it has no weight. Like any other fact, it is to be considered and dealt with by the jury, by you, who are the triers of the

facts. You should give the accomplice's testimony such weight as you think it deserves in light of all the facts and circumstances.

However, because of the possible interest an accomplice may have in testifying, his testimony should be weighed with caution and scrutinized with care. It is the universal rule in the Federal courts that a defendant may be convicted on the uncorroborated testimony of a single accomplice if that testimony is found by you to show guilt beyond a reasonable doubt.

It does not follow because a person has acknowledged participation in a crime or is an accomplice, that he is not capable of giving a truthful version of what occurred. That is for you to decide. As with courage, so it is truthfulness. It frequently comes from the most unlikely sources. Those from whom we really expect the truth, very often we find it not forthcoming, and those from whom we would hardly expect it, from them sometimes a veritable avalanche of convincing disclosure gushes forth.

As you contemplate the testimony before you of a confessed perjurer, which you must examine with caution and weigh with great care, I would suggest you might consider whether she presented an instance of PURGE, or perjury, spelled PERJURY. Did the witness purge herself, has she for the moment pushed aside all the rot in her makeup? That is possible. You have no concern with the government's estimate and no concern with the estimate of counsel for the defense, and no concern by the estimate of the judge. I venture none. I just suggest to you guides for the weighing of testimony." (J.A. 190–92)

immediately after the charge on the credibility of the accomplice Martinez, were quite negative.[8] Observing that interest in the outcome of litigation creates a motive to perjure oneself, he then noted that the interest of a criminal defendant is "of a character possessed by no other witness." In *Araujo*, a similar charge had not been objected to in the district court and thus was not preserved for review. Nevertheless, we believed it so incorrect that we expressly disapproved of it. *Id.* at 289–90. *See also, Persico*, 349 F.2d at 10–12. Such a charge, given in conjunction with the accomplice charge above, was prejudicial to the appellants, particularly since Martinez, who was more deeply involved and faced potentially more serious charges than appellants, may well have viewed her version of the facts as a way to obtain a lenient sentence on reduced charges.

■ The basic errors in the charge were aggravated by other conduct of the district judge. At one point in the trial, he vouched for the credibility of the prosecutor by referring the jury to "the words of the distinguished Assistant United States Attorney who's been handling this case before us." It is not proper for a court to refer to the high character of counsel, especially of only one side, Thomas, *Improvements in Charges to Juries*, 1 F.R.D. 141–42 (1940). Furthermore, when the two hour and forty minute charge ended at 6:25

p.m., the court informed the jury that it would be taken to dinner, after which it would begin deliberations. If it did not reach a verdict by "10:30 or close to 11:00," the jurors were told, they would be driven home, only to return the next morning. He then stated, "It is as simple as that. There has to be a verdict." This was further error. *United States v. Stewart*, 513 F.2d 957, 959 (2d Cir.1975); *see also Hodges v. United States*, 408 F.2d 543, 552–54 (8th Cir.1969).

■ Viewing the charge as a whole, *Cupp v. Naughten*, 414 U.S. 141, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973), strengthens our conviction that the error here was not harmless. The trial judge repeatedly stated to the jury that he would never tell them what his views of the case were,[9] remarks which compounded the effect of the various matters described above. Nor were cautionary instructions sufficient to cure error of this kind. The erroneous instructions here could not be cured by ritualistic statements telling the jury that the issues were solely for the jury to decide. Appellants strenuously urged their innocence, and the case turned solely on their credibility as weighed against that of Martinez. Moreover, many of the instructions have been specifically disapproved in prior decisions. In such circumstances, error of this kind is not harmless.

Reversed.[10]

---

8. "The testimony of the defendant is before you, you and only you can determine how much credibility or believability his testimony is entitled to or how little. However, I instruct you that it is the law that interest creates a motive to give false testimony, that the greater the interest, the stronger is the temptation, that the interest of a defendant in the result of a criminal trial is of a character possessed by no other witness and is, therefore, a matter which may affect the believability which shall be given to such testimony.

   However, let me point out with emphasis the fact that the defendant has such an interest in the case does not mean that he or she testified falsely. It is exclusively for you, the jury, to decide whether the testimony was given truthfully and how much weight to be given by you to such testimony." (J.A. 189–90)

9. "At no time read into my words or the emphasis of my voice how I feel about the facts, and I am going to tell you something that is going to surprise and amaze you: You may not know this, but a judge of the United States District Court, such as the judge now speaking to you, has a perfect right to comment on the evidence. You can't do that in a state court.

   I have the power to say at any trial, 'witness so and so, I disbelieve from beginning to end. I wouldn't believe him or her on a stack of bibles from the floor to the ceiling.' I have a perfect right to say it, so long as I add, 'but you are not bound by my estimate.' I have never done it and never will." (J.A. 117)

10. In the event of a new trial, we note that, under *United States v. Diogo*, 320 F.2d 898 (2d Cir.1963), Assi and Charres' convictions on Count II of making false statements to the INS

BARTELS, Senior District Judge, concurring.

I concur in the result only.

---

cannot be based on the presentation that El-Gendi and Martinez were married, since the marriage, however voidable, actually took place. Such a conviction must be based on the false statement of a common residence. The jury should also be charged that Assi and Charres

must have had reason to know that El-Gendi and Martinez would make such false statement.

