**Maurice SCHICK, Appellant,**

v.

**George J. REED, Chairman of the United States Board of Parole, et al.**

**No. 72-1508.**

United States Court of Appeals, District of Columbia Circuit.

Argued June 18, 1973.

Decided July 23, 1973.

Rehearing denied Oct. 1, 1973.

---

Caryl S. Cole, Washington, D. C., with whom Robert N. Sayler, Washington, D. C., was on the brief, for appellant.

James W. Diehm, Asst. U. S. Atty., with whom Harold H. Titus, Jr., U. S. Atty., John A. Terry, and Michael A. Katz, Asst. U. S. Attys., were on the brief, for appellees.

Before WILBUR K. MILLER, Senior Circuit Judge, and WRIGHT and ROBB, Circuit Judges.

ROBB, Circuit Judge:

In 1954 the appellant Schick, a master sergeant in the United States Army, was convicted by a court-martial of the premeditated murder of an 8-year old girl, in violation of Article 118 of the Uniform Code of Military Justice. 10 U.S. C. § 918 (1970).[1] The court-martial

---

1. Article 118 (now, 10 U.S.C. § 918) reads:
 Any person subject to this code who, without justification or excuse, unlawfully kills a human being, when he—
 (1) has a premeditated design to kill;

\* \* \* \* \*

shall suffer death or imprisonment for life as a court-martial may direct. May 5, 1950, ch. 169 § 1 (Art. 118), 64 Stat. 140.

sentenced Schick to death. In 1960 President Eisenhower commuted the sentence to a dishonorable discharge and imprisonment for life upon the express condition that Schick should "never have any rights, privileges, claims, or benefits arising under the parole and suspension or remission of sentence laws of the United States and the regulations promulgated thereunder governing Federal prisoners confined in any civilian or military penal institution (18 USC § 4201 et seq., 10 U.S.C. 3662 et seq., [sic] 10 USC 871, 874), or any acts amendatory or supplementary thereof." Schick was thereafter committed to the custody of the Attorney General and is now confined in the United States Penitentiary at Lewisburg, Pennsylvania. The United States Board of Parole has declined to consider him for parole although in the absence of the condition attached to the President's commutation he would be eligible for such consideration. See 18 U.S.C. § 4202; 10 U.S.C. § 858 (1970).

Schick filed this action in the District Court, seeking a declaration of his eligibility for consideration for parole pursuant to 18 U.S.C. § 4202, and an order directing the members of the Board promptly to consider him for parole. The District Court granted the defendant's motion for summary judgment upon the ground "that the conditional commutation of plaintiff's sentence was the result of the exercise by the President of his powers under Article II of the Constitution to grant reprieves and pardons for offenses against the United States, and of his authority as Commander in Chief of the Armed Forces and under the provisions of the Uniform Code of Military Justice". Schick appeals. We affirm.

■■ In commuting Schick's sentence the President exercised the authority conferred upon him by Article II, section 2, clause 1 of the Constitution, providing that the President "shall have Power to grant Reprieves and Pardons for Offenses against the United States, except in Cases of Impeachment." That

power includes the authority to commute a sentence of death to imprisonment for life. Biddle v. Perovich, 274 U.S. 480, 47 S.Ct. 664, 71 L.Ed. 1161 (1927). Moreover, it is settled that a pardon or a commutation of a sentence may be granted on condition. Ex parte Grossman, 267 U.S. 87, 120, 45 S.Ct. 332, 69 L.Ed. 527 (1925); Semmes v. United States, 91 U.S. 21, 27, 23 L.Ed. 193 (1875); United States v. Klein, 13 Wall. (80 U.S.) 128, 142, 20 L.Ed. 519 (1871); Ex parte Wells, 18 How. (59 U.S.) 307, 15 L.Ed. 421 (1855); Stroud v. Johnston, 139 F.2d 171, 172 (9th Cir. 1943), cert. denied, 321 U.S. 796, 64 S.Ct. 846, 88 L.Ed. 1085 (1944). The appellant contends, nevertheless, that the condition imposed in this case is illegal and invalid, since it contravenes the statute providing that a prisoner shall be eligible for parole after serving fifteen years of a life sentence. 18 U.S.C. § 4202 (1970).

■ The courts have stated many times that Congress cannot control or regulate the action of the President in granting pardons or commutations. See Ex parte Grossman, supra; The Laura, 114 U.S. 411, 414, 5 S.Ct. 881, 29 L.Ed. 147 (1885); Ex parte Garland, 4 Wall. (71 U.S.) 333, 380, 18 L.Ed. 366 (1866); Yelvington v. Presidential Pardon & Parole Attorneys, 94 U.S.App.D.C. 2, 4, 211 F.2d 642, 644 (1954); Thompson v. Duehay, 217 F. 484, 487 (D.C.W.D. Wash.1914), aff'd, 223 F. 305 (9th Cir. 1915). Had Congress attempted to fetter the Presidential power by the parole statute a constitutional question might be presented. We think it clear however that Congress had no intention of interfering with the President's authority, and has not done so. This appears from the history of the parole statute itself, noted by the Attorney General in his opinion, Pardoning Power of the President, 41 Op. Att'y Gen. 251, 255 (1955). The Attorney General said:

As enacted in 1910, section 10 [of the parole statute] provided that nothing in the act "shall be construed to impair the power of the President of the

United States to grant a pardon or commutation in any case." 36 Stat. 821, 18 U.S.C. (1946 ed.) 723. This provision does not appear in the 1948 revision of title 18 of the U.S.Code, and the Reviser's Note to section 3570 of that title, dealing with Presidential remission of a sentence, states that the word "pardon" was omitted "as unnecessary in view of the pardoning power of the President under Const. Art. 2, § 2, cl. 1. 'This power of the President is not subject to legislative control.' Ex parte Garland, 1866, 4 Wall. 380." [18 L.Ed. 366]

██ Turning to the Uniform Code of Military Justice, Art. 71(a), 10 U.S.C. § 871(a), in force at the time of Schick's sentence, we find this provision:

> No court-martial sentence extending to death or involving a general or flag officer *shall be executed until approved by the President. He shall approve the sentence or such part, amount, or commuted form of the sentence as he sees fit,* and may suspend the execution of the sentence or any part of the sentence, *as approved by him,* except a death sentence. (Emphasis added). 64 Stat. 131.

The Uniform Code of Military Justice further provided, Art. 76, (now 10 U.S. C. § 876):

> The appellate review of records of trial provided by this code, the proceedings, findings, and sentences of courts-martial as approved, reviewed, or affirmed as required by this code . . . shall be final and conclusive, and orders publishing the proceedings of courts-martial and all action taken pursuant to such proceedings shall be binding upon all departments, courts, agencies, and officers of the United States, subject only to action upon a petition for a new trial as provided in article 73 and to action by the Secretary of a Department as provided in article 74, *and the authority of the President.* (Emphasis added). 64 Stat. 132–333.

From the unambiguous language of these statutes it is apparent that Congress intended to, and did, preserve fully the commutation powers of the President by permitting him to "approve * * * such * * * commuted form of [a] sentence as he sees fit." It is also apparent that Congress intended that the action of the President, in the exercise of those powers, should be final, conclusive and binding upon all departments, courts, agencies and officers of the United States. In short, the President's action in this case was not inconsistent with the wishes of Congress as expressed in the parole statute.

Our conclusion on this branch of the case is in accord with the opinion of the Attorney General expressed in *Pardoning Power of the President, supra,* and with the decisions of the Supreme Court of California in Green v. Gordon, 39 Cal. 2d 230, 246 P.2d 38, cert. denied, 344 U. S. 886, 73 S.Ct. 187, 97 L.Ed. 686 (1952); and Ex parte Collie, 38 Cal.2d 396, 240 P.2d 275 (1952), cert. denied, Collie v. Heinze, 345 U.S. 1000, 73 S.Ct. 1145, 97 L.Ed. 1406 (1953). A like result was reached by the Circuit Court of Appeals for the Tenth Circuit in Hurt v. Moseley, No. 71–1307, decided in an unreported opinion September 13, 1971.

 The appellant argues that confinement without the possibility of parole is cruel and unusual punishment. We think there is nothing to this contention. "By common understanding imprisonment for life is a less penalty than death." Biddle v. Perovich, 274 U. S. 480, 486, 47 S.Ct. 664, 665, 71 L.Ed. 1161 (1927), (Holmes, J.). In light of the atrocious nature of Schick's offense the commuted sentence is not out of proportion to his crime. We note further that the federal narcotics statute which precluded the possibility of parole in certain cases, 26 U.S.C. § 7237, was repeatedly upheld against attack on Eighth Amendment grounds. See for example, United States v. Williams, 143 U.S.App.D.C. 16, 442 F.2d 738 (1970); United States v. Lozaw, 427 F.2d 911

(2d Cir. 1970). This statute applied even in the cases of prisoners sentenced to serve as much as forty years. We also reject the contention that the commuted sentence denies the appellant the equal protection of the laws. Schick is in no worse position than others of his class who were convicted by a court-martial of premeditated murder and sentenced to death during a period when the death penalty was being enforced.

A contention not made in the appellant's brief, but advanced at oral argument, is based upon the decision of the Supreme Court in Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). The argument runs as follows: Furman v. Georgia means that the provision for the death penalty in Article 118, UCMJ, 10 U.S.C. § 918 is invalid. Had this been the law at the time Schick was sentenced, he could have been sentenced only to imprisonment for life. 10 U.S.C. § 918. He then would have been committed to a United States Disciplinary Barracks or to a Federal Penitentiary. 10 U.S.C. §§ 858, 3661. In either event he would now be eligible to be considered for parole. 10 U.S.C. § 3663; 18 U.S.C. § 4202.

Had Schick been under a death sentence when Furman v. Georgia was decided that ruling would have required the excision of the constitutionally invalid sentence. Robinson v. Neil, 409 U.S. 505, 93 S.Ct. 876, 35 L.Ed.2d 29 (1973). The flaw in Schick's argument is that when the *Furman* case was decided he was not under a death sentence, and there was therefore nothing to excise. Indeed, as a matter of law, a final and effective sentence of death was never imposed upon Schick. Unlike the judgment and sentence of a court, the sentence imposed by the court-martial was not effective until approved by the President, whose action was by statute made a part of the sentencing process. *See* Article 71(a) UCMJ, 10 U.S.C. § 871 (a). The President did not approve the sentence.

 Finally, we are mindful that a pardon or commutation "is a part of the Constitutional scheme. When granted, it is the determination of the ultimate authority that the public welfare will be better served by inflicting less than what the judgment fixed." Biddle v. Perovich, 274 U.S. 480, 486, 47 S.Ct. 664, 665, 71 L.Ed. 1161 (1927). Such an action of the President, explicitly authorized by the Constitution and exercised in a lawful and proper manner, may not be reviewed by a court, and is not to be undone twelve years later upon the basis of *ex post facto* hypothesis and rationalization. *See* Ex parte Grossman, 267 U.S. 87, 121–122, 45 S.Ct. 332, 69 L. Ed. 527 (1924).

The judgment of the District Court is affirmed.

J. SKELLY WRIGHT, Circuit Judge, dissenting:

The United States Board of Parole has refused to consider appellant for parole because the commuted sentence imposed by President Eisenhower includes a "no parole" condition. The sole issue presented is whether this condition is lawful. We are not asked to release appellant, but simply to order the Board to consider his parole application under the same standards as those governing all other federal prisoners.

Appellant brought this action and the District Court considered and decided the case prior to the Supreme Court's decision in Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). The case therefore proceeded under the assumption that the death penalty initially imposed by the court-martial was valid. Although the President has unquestioned power under the Constitution to commute a death sentence, appellant argued that he lacked power to impose a "no parole" condition. As the majority opinion here indicates, the District Court, with good reason, rejected this argument.

But the matter does not end there. While this case was pending on appeal, the Supreme Court issued its decision in *Furman*, holding that "the imposition and carrying out of the death penalty"

constitutes cruel and unusual punishment in violation of the Eighth Amendment. The Supreme Court, to paraphrase its own words, "has not hesitated" to apply *Furman* retrospectively, without regard to the criteria normally considered in deciding whether to give retrospective effect to a new constitutional rule. Robinson v. Neil, 409 U.S. 505, 508, 93 S.Ct. 876, 35 L.Ed.2d 29 (1973). *See, e.g.,* Stewart v. Massachusetts, 408 U.S. 845, 92 S.Ct. 2845, 33 L.Ed.2d 744 (1972); Marks v. Louisiana, 408 U.S. 933, 92 S.Ct. 2849, 33 L.Ed.2d 746 (1972). In my view, retrospective application of *Furman* to appellant's case requires us to vacate the death sentence imposed by the court-martial and substitute the only other sentence which lawfully could have been imposed—life imprisonment with the possibility of parole.

### I

Although the *Furman* decision itself simply remanded the death penalty cases for further proceedings without spelling out the nature of those proceedings, all courts considering the issue have recognized that retroactive application of *Furman* to any given prisoner requires that the death sentence be vacated and the judgment modified to provide for the appropriate alternative punishment specified by statute for the crime for which the prisoner was sentenced to death. *See* Anderson v. State, Fla., 267 So.2d 8, 9 (1972); In re Baker, Fla., 267 So.2d 331, 332 (1972); Huggins v. Commonwealth, 213 Va. 327, 191 S.E.2d 734 (1972); Sullivan v. State, 229 Ga. 731, 194 S.E.2d 410 (1972). *See also*

People v. Anderson, 6 Cal.3d 628, 657 n. 45, 100 Cal.Rptr. 152, 171 n.45, 493 P. 2d 880, 899–900 n.45 (1972). Where there is but one statutory alternative—for example, life imprisonment—that alternative must be imposed. *See* People v. Anderson, *supra.* Where the alternative sentence is discretionary—for example, rape statutes where the alternative to the death sentence is imprisonment for life or for any term of years within the discretion of the court—the case must be remanded to the sentencing court for resentencing. *See* Anderson v. State, *supra,* 267 So.2d at 10; Huggins v. Commonwealth, *supra. Cf.* Sullivan v. State, *supra.* In other words, the court's role after *Furman* is to ensure that the prisoner be treated as if the death sentence was not an available sentence at the time of the original sentencing.[1]

Application of this rule to appellant's case is quite simple. Article 118 of the Uniform Code of Military Justice, 10 U. S.C. § 918 (1970), under which appellant was convicted of premeditated murder, provides that one so convicted "shall suffer death or imprisonment for life as a court-martial may direct." A sentence of death was imposed by the court-martial, and its decision was affirmed by both the Board of Review and the United States Court of Military Appeals. Under *Furman* the death sentence so imposed was unconstitutional and therefore null and void. The only lawful alternative at the time of the original sentencing was a sentence of "imprisonment for life." That sentence must now be substituted for the original death sentence, and appellant must be treated as if he

---

I. *See also* Sullivan v. State, 229 Ga. 731, ——, 194 S.E.2d 410, 412 (1972) (Jordan, J., concurring specially): "[T]he life sentence now to be imposed * * * shall be subject to all laws and regulations applicable to such sentence as if it had been rendered on the date of the original sentence." It has been assumed that prisoners whose sentences were changed from death to life imprisonment pursuant to *Furman* would become eligible for parole. Thus the legislature of

the State of Florida enacted special legislation after *Furman* purporting to require substitution of a life sentence without parole for those sentenced to death prior to *Furman. See* Anderson v. State, Fla., 267 So.2d 8, 9 (1972). As the Supreme Court of Florida recognized, this statute raised constitutional problems which the court avoided by resentencing prisoners to life imprisonment prior to the effective date of the new statute. *See* In re Baker, Fla., 267 So.2d 331, 334–335 (1972).

were sentenced to life imprisonment on the date of his original sentence.

Pursuant to statute, all persons sentenced to imprisonment for life by a court-martial eventually become eligible to be considered for parole, there being no statutory authority for a life sentence without parole. If the prisoner is confined in the United States Disciplinary Barracks, his parole opportunities are governed by the parole authority granted the Secretary of the Army, see 10 U.S.C. §§ 952, 953 (1970), and the regulations promulgated pursuant thereto, and he becomes eligible to be considered for parole after serving 10 years of his sentence. See Headquarters, Department of the Army, Army Regulation 190–26, ch. 1, ¶ 1–4(a)(2) (March 20, 1972). If the prisoner is transferred to a federal penitentiary, his parole opportunities are governed by the same statutes and regulations as are applicable to all other federal prisoners, see 10 U.S.C. § 858 (1970), and he becomes eligible to be considered for parole after serving 15 years of his sentence. See 18 U.S.C. §§ 4202, 4203 (1970). Since appellant has been imprisoned since 1954, he would now be eligible to be considered for parole under either eventuality.

Applying *Furman* retroactively in this manner, the commutation and condition imposed by President Eisenhower are a nullity, as they were based on an illegal premise. When appellant was sentenced, the options available to the sentencing court were death or life imprisonment with the possibility of parole. Since *Furman* retroactively strikes the death option, the life option with parole possibilities is retroactively imposed as of the date of sentencing. Any subsequent imposition of a sentence of life imprisonment without parole would, of course, increase appellant's sentence and thus would be beyond the President's constitutional authority to grant reprieves and pardons. See Biddle v. Perovich, 274 U.S. 480, 486, 47 S.Ct. 664, 71 L.Ed. 1161 (1927); Ex parte Wells, 59 U.S. (18 How.) 307, 310, 15 L.Ed. 421 (1855).

## II

The majority seeks to avoid this logic by noting that appellant was not under a death sentence at the time *Furman* was decided. But this misconstrues both the *Furman* decision itself and the doctrine of retroactivity. *Furman* did more than stop executions, though, of course that was its most dramatic effect. Not only did the Court say that the "carrying out" of the death penalty is unconstitutional, but it also expressly held, in language we must assume was carefully chosen, that "the *imposition* * * * of the death penalty * * * constitutes cruel and unusual punishment * * *." 408 U.S. at 239–240, 92 S.Ct. at 2727. (Emphasis added.) Because *Furman* is totally retroactive, a death sentence imposed before *Furman* is an illegal sentence. And those who were sentenced to death prior to *Furman* not only cannot have their sentences executed; they must be resentenced with a lawful sentence.

Nor is it significant that appellant is not now subject to a death sentence, since he is clearly suffering adverse consequences from the prior imposition of an illegal death sentence. Where a new constitutional rule is fully retroactive, the courts must do more than amend the direct consequences of prior violations of the rule. In addition, they must root out as much as possible the adverse, albeit indirect, legal consequences of such prior violations.

A good example of this process may be seen in the Supreme Court's decisions concerning the right to counsel in state felony trials. That right, recognized in Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), was held wholly retroactive in Pickelsimer v. Wainwright, 375 U.S. 2, 84 S.Ct. 80, 11 L.Ed.2d 41 (1963) (direct appeal), and Kitchens v. Smith, 401 U.S. 847, 91 S.Ct. 1089, 28 L.Ed.2d 519 (1971) (*habeas corpus*). These cases remedied the direct consequences of prior violations of the right to counsel by overruling felony convictions obtained without counsel. But the retroactivity doctrine extended

much further to embrace indirect adverse consequences stemming from prior violations of the right to counsel. In Burgett v. Texas, 389 U.S. 109, 88 S.Ct. 258, 19 L.Ed.2d 319 (1967), for example, the Court held that an uncounselled felony conviction obtained prior to *Gideon* could not be used to "enhance punishment" for a subsequent offense through operation of a recidivist statute. Under any other rule, the Court noted, "the accused in effect suffers anew" from the pre-*Gideon* deprivation of his right to counsel. 389 U.S. at 115, 88 S.Ct. 258. Similarly, only recently the Court held in Loper v. Beto, 405 U.S. 473, 92 S.Ct. 1014, 31 L.Ed.2d 374 (1972), that an uncounselled conviction obtained prior to *Gideon* could not be used to impeach a defendant's credibility, again noting that the defendant had "suffered anew" from the pre-*Gideon* violation, 405 U.S. at 484, 92 S.Ct. 1014.

The present case thus falls squarely within normal concepts of retroactivity. Although appellant is not now under a death sentence, he has suffered and continues to suffer enhanced punishment— the loss of his statutory right to be considered for parole—as a result of an illegally imposed death sentence.

Further guidance may be found in Jones v. Cunningham, 371 U.S. 236, 83 S.Ct. 373, 9 L.Ed.2d 285 (1963), which held that a petitioner could maintain a *habeas corpus* action challenging his conviction even though his punishment had been alleviated by his being placed on parole. The rationale of that decision was that the petitioner still suffered certain restraints from the underlying conviction, albeit fewer restraints than incarceration. So here, appellant should be permitted to attack his death sentence, even though it has been ameliorated by presidential pardon, because he is still suffering restraints from the underlying illegal sentence.

It is also important to note that appellant's commuted sentence shares many of the evils of the original death sentence. Like the death sentence, imprisonment for life without the possibility of parole is inconsistent with the principle that the "rehabilitation of the convict [is] a basic purpose of criminal justice." Furman v. Georgia, *supra*, 408 U.S. at 306, 92 S.Ct. at 2760 (Mr. Justice Stewart, concurring). *See also id.* at 343, 92 S.Ct. 2726 (Mr. Justice Marshall, concurring); Weems v. United States, 217 U.S. 349, 381, 30 S.Ct. 544, 54 L.Ed. 793 (1910). While I agree that the nonrehabilitative nature of life imprisonment without parole is not sufficient to declare that penalty itself cruel and unusual, the relationship it bears to the death penalty certainly has significance for the retroactive application of *Furman* to this case. For in delimiting its retroactive scope, one must keep in mind the evil sought to be remedied by a new constitutional rule. *Compare* Tehan v. Shott, 382 U.S. 406, 86 S.Ct. 459, 15 L.Ed.2d 453 (1966), *with* Burgett v. Texas, *supra*.

As indicated earlier, there is no provision in federal law—civilian or military —for a sentence of life imprisonment without parole. Neither a court-martial nor a judge can impose such a sentence. Congress has ensured that the primary focus of the federal penal system is rehabilitative, looking toward the day when the prisoner can return to society.[2] The death penalty was a glaring exception, and it has now been held illegal. But the same nonrehabilitative exception

2. Indeed, the principle of parole was recognized in the military long before parole became available for civilian prisoners. The Act of March 3, 1873, ch. 249, § 6, 17 Stat. 583, a direct predecessor of the current military parole statute, provided: "[The commandant of the military prison] shall take note and make record of the good conduct of the convicts, and shall shorten the daily time of hard labor for those who, by their obedience, honesty, industry, or general good conduct, earn such favors; and the Secretary of War is authorized and directed to remit, in part, the sentences of such convicts, and to give them an honorable restoration to duty in case the same is merited * *." The first parole statute for civilian prisoners was the Act of June 25, 1910, ch. 387, 36 Stat. 819.

lives on in muted form in the sentence appellant is now serving.

### III

I confess a certain difficulty in comprehending the majority's argument that a sentence of death was never really imposed on appellant because, under the governing statute, the sentence could not be executed until approved by the President. As the majority properly notes elsewhere, the President's power to grant commutations is a constitutional, not a statutory, power. The President can pardon any conviction for an offense against the United States, whether or not authority to do so is granted by statute. Article 71(a), 10 U.S.C. § 871(a) (1970), which provides that no sentence of death can be executed before approved by the President, simply changes the procedure whereby pardons are granted; it does not affect the substance of the President's pardoning power. In a civilian death penalty case, the prisoner bears the burden of bringing his case to the President's attention for purposes of a commutation. In military death penalty cases, however, the Government was assigned the burden of having a death penalty affirmatively approved. The power of the President in both cases is the same, the only difference being the allocation between the prisoner and the Government of the burden of going forward to invoke that power. A sentence of death by a court-martial is every bit as final and effective a sentence of death as one imposed by a civilian court.

Rather than support the majority, Article 71(a) demonstrates that the commuted sentence is integrally related to the original death sentence imposed by the court-martial. As the language of Article 71(a) suggests, the sentence approved by the President is not a new sentence, but is simply a "commuted form of the sentence" imposed by the court-martial. It has no basis in law except as such, and is therefore no more lawful than the illegal sentence itself.

It is argued that we should not apply *Furman* retroactively in the manner suggested because to do so amounts to review by a court of the President's exercise of his constitutional power to grant pardons and reprieves. But to apply *Furman* retroactively to appellant in no way indicates any disapproval by this court of the manner in which President Eisenhower exercised his powers of clemency. It was concededly reasonable for both the court-martial and the President not to have foreseen the *Furman* decision. They quite properly assumed that the death penalty was a lawful sentence. But as Mr. Justice Stewart indicated in Loper v. Beto, supra, 405 U.S. at 484, 92 S.Ct. at 1020:

> " * * * It would surely be unreasonable * * * to expect the judge at Loper's trial to have anticipated *Gideon*, just as it would have been unreasonable to have expected the judge at Gideon's trial to have foreseen our later decision in that case. But a necessary result of applying any decision retroactively is to invalidate rulings made by trial judges that were correct under the law prevailing at the time the judges made them. * * * "

(Footnote omitted.) So here, our substitution of life imprisonment with the possibility of parole for the death sentence as commuted by the President does not disparage in any way the President's exercise of his pardoning power. Rather it simply reflects the fact that a retroactive change in the law has been made.

With all due respect, the majority's refusal to follow the Supreme Court's dictate and treat *Furman* as totally retroactive seems to represent disagreement with the concept of retroactivity itself. It is suggested that decisions made on the basis of rules then assumed valid are "not to be undone twelve years later upon the basis of *ex post facto* hypothesis and rationalization." But the precedents will not tolerate this disparaging view of retroactive application of

new constitutional rules. Was it *"ex post facto* hypothesis and rationalization"* when the Supreme Court ruled that the petitioner in Kitchens v. Smith, *supra,* who had been convicted without counsel some 19 years before Gideon v. Wainwright, was entitled to release as a result of that decision?

There are all too many for whom the Supreme Court's opinion in *Furman* came too late. For them what is done is done. Even for appellant, retroactive application of *Furman* cannot erase the mental anguish he no doubt experienced during the six years he waited on death row from the time he was initially sentenced to die to the time of the President's commutation. But I can see no reason for not alleviating those effects of the illegal death sentence imposed on appellant which can still be cured. The crime for which appellant was convicted was atrocious, as the majority notes, though the strong evidence of mental illness as a cause of the crime must temper that observation.[3] Under the law, however, even murderers sentenced to life imprisonment are eligible for parole if they can satisfy the Board of Parole that "there is a reasonable probability that such prisoner will live and remain at liberty without violating the laws, and \* \* \* [that] such release is not incompatible with the welfare of socie-

ty." 18 U.S.C. § 4203 (1970). In my judgment, *Furman* requires that appellant be given that chance.

I respectfully dissent.

---

3. The facts of the case were that after a chance encounter and a 10-minute conversation appellant simply grabbed his 8-year-old victim and choked her. There was no evidence of a sexual assault. In his confession to the authorities appellant stated he "just had an uncontrollable urge to kill her" and had done so "just because she was there."

The sole defense raised at the court-martial related to the sanity issue. Four Army psychiatrists who had examined appellant in Japan found him legally responsible, but the two Japanese psychiatrists who were appointed to examine him disagreed. On appeal the Court of Military Appeals directed that appellant be transferred to the Menninger Clinic for further examination. All the psychiatrists who examined him there, including

Dr. Menninger himself, concluded that mental illness was a cause of the killing. Evidently appellant had a lifelong history of mental illness manifested by periodic episodes of uncontrolled violence and psychotic behavior, and had been admitted for in-patient psychiatric hospitalization on 13 occasions during World War II. Indeed, during a temporary separation from the Army after 1946, he received disability benefits based in part on his psychiatric difficulties.

Although the reviewing authorities persisted in their affirmance of the court-martial's finding of responsibility, the record clearly shows that the strong evidence of mental illness played a crucial role in obtaining a presidential commutation.