IN THE SUPREME COURT OF THE STATE OF DELAWARE

CRAIG A. ZEBROSKI, § 
§ No. 294, 2017
Appellant, §
§
§ Court Below: Superior Court
v. § of the State of Delaware
§
STATE OF DELAWARE, § Cr. ID No. 9604017809 (N)
§
Appellee. §

Submitted: January 17, 2018
Decided: January 25, 2018


Before **STRINE**, Chief Justice; **VALIHURA** and **TRAYNOR**, Justices.

Upon appeal from the Superior Court. **AFFIRMED.**

Stamatios Stamoulis, Stamoulis & Weinblatt LLC, Wilmington, Delaware; Edson A. Bostic and Tiffani D. Hurst, Office of the Federal Public Defender, Wilmington, Delaware, *Attorneys for Appellant*.

Elizabeth R. McFarlan, Department of Justice, Wilmington, Delaware, *Attorney for Appellee*.

**TRAYNOR**, Justice:

Prior to our decision in *Rauf v. State*,[1] which held that Delaware's capital sentencing scheme violates the Sixth Amendment to the United States Constitution, Craig Zebroski was convicted of two counts of first-degree murder and sentenced to death. After we held, in *Powell v. State*,[2] that *Rauf* is retroactive, his death sentence was vacated and he was resentenced to a mandatory term of life without parole.

Zebroski contends that this sentence runs afoul of both *Rauf* and the United States Constitution. He reads our decision in *Rauf* as having invalidated not just Delaware's capital sentencing scheme, but all of 11 *Del. C.* § 4209—the statute that specifies the penalties for first-degree murder, which is where the capital sentencing procedures are codified. Section 4209 provides that first-degree murder shall be punished either by death or by life without parole, but because, under Zebroski's reading, *Rauf* invalidated the entirety of section 4209, he believes the statute's life-without-parole alternative cannot be enforced and he must instead be sentenced to the residual punishment prescribed by statute for all other class A felonies: a term of years ranging from fifteen years to life. And he contends if *Rauf* did not strike down all of section 4209, it should have, because the life-without-parole alternative is not severable from the rest of the statute.

---

[1]    145 A.3d 430 (Del. 2016) (per curiam).
[2]    153 A.3d 69 (Del. 2016) (per curiam).

2

Aside from his statutory challenge, Zebroski contends that imposing a mandatory sentence of life without parole on him violates both his Eighth Amendment and due process rights.

*Rauf* did not, as Zebroski believes, invalidate the entirety of section 4209, and, as we said in *Powell*, the statute's life-without-parole alternative is the correct sentence to impose on a defendant whose death sentence is vacated. And we find no constitutional fault in imposing that sentence on him.

## I
## A

On an afternoon in 1996, Zebroski was visiting a friend's apartment.[3] Two others were there, and the four of them "spent the day drinking, smoking marijuana, and ingesting PCP."[4] At some point during the afternoon, Zebroski proposed to one of them, Michael Sarro, that the two of them rob a nearby gas station nearby. Shortly before midnight, they headed out. After surveilling the station to ensure it was empty of customers, Zebroski took Sarro's semi-automatic handgun, and they entered the station.

Inside, they found a lone attendant. Zebroski pointed the gun at him and demanded he open the cash register, but the attendant did not respond. Both Sarro

---

[3] These facts are taken from our opinion affirming his conviction and sentence on direct appeal. *Zebroski v. State*, 715 A.2d 75 (Del. 1998).

[4] *Id.* at 77.

and Zebroski—who was standing only three or four feet from the attendant, still pointing the gun—threatened him, but he did not open the register. After Sarro tried and failed to open it himself, Zebroski shot the attendant in the forehead, killing him.

Zebroski was charged with two counts of first-degree murder—one count of intentional killing[5] and one count of felony murder.[6] He was found guilty of both at trial. Under the then-governing capital sentencing scheme, the jury found, by a vote of nine to three, that the aggravating circumstances outweighed the mitigating circumstances and recommended a sentence of death. The Superior Court agreed. On direct appeal, we affirmed both the conviction and the sentence.[7]

B

After we decided *Rauf* and *Powell*, the Superior Court vacated Zebroski's death sentence. But he and the State disagreed about what sentence he should receive in lieu of death.

Under 11 *Del. C.* § 4205, punishment for a class A felony in Delaware shall be "not less than 15 years up to life imprisonment . . . except for conviction of first degree murder in which event § 4209 of this title shall apply."[8] Section 4209(a), in turn, provides that "[a]ny person who is convicted of first-degree murder . . . shall

---

[5]     *See* 11 Del. C. § 636(a)(1).
[6]     *See* § 636(a)(2).
[7]     *Zebroski*, 715 A.2d at 76–77.
[8]     § 4205(b)(1).

be punished by death or by imprisonment for the remainder of the person's natural life without benefit of probation or parole or any other reduction."[9] The remainder of section 4209 sets forth detailed capital sentencing procedures, some of which, *Rauf* held, violate the Sixth Amendment.[10]

In the State's view, determining which sentence Zebroski should receive is straightforward. Section 4209 provides that first-degree murder "shall be punished by death or by imprisonment for the remainder of the person's natural life without . . . parole," so if he cannot be sentenced to death, then he must be sentenced to life without parole. But Zebroski contends that when *Rauf* struck down the death penalty, *Rauf* invalidated all of section 4209—not just the capital sentencing scheme—and so, with section 4209 unenforceable, he must be sentenced instead to fifteen years to life, the punishment specified in section 4205 for class A felonies.

II

*Rauf* was decided on the basis of five certified questions. The last of those questions asked whether the statute was severable, were we to conclude that the statute has constitutional infirmities. After concluding that certain steps in the capital sentencing process ran afoul of the Sixth Amendment, we turned to the question of severability and answered that question in the negative:

---

[9]  § 4209(a).
[10]  *See* § 4209(b)–(h).

[Question Five] If any procedure in 11 *Del. C.* § 4209's capital sentencing scheme does not comport with federal constitutional standards, can the provision for such be severed from the remainder of 11 *Del. C.* § 4209, and the Court proceed with instructions to the jury that comport with federal constitutional standards?

No. Because the respective roles of the judge and jury are so complicated under § 4209, we are unable to discern a method by which to parse the statute so as to preserve it. Because we see no way to sever § 4209, the decision whether to reinstate the death penalty—if our ruling ultimately becomes final—and under what procedures, should be left to the General Assembly.[11]

Zebroski reads our answer to hold that all of section 4209, including the alternative punishment of life without parole that the General Assembly incorporated into the statute for cases where the death penalty is not imposed, is invalid. That, he says, means that a defendant whose death sentence is vacated must be resentenced under section 4205, which would act as a backstop for the now-unenforceable section 4209.

We spoke to this issue in *Powell*, which asked us to decide whether *Rauf*'s invalidation of the death penalty had retroactive effect. After concluding that it did, we went on to explain what that would mean for Powell's sentence: "Powell's death sentence must be vacated and he must be sentenced to 'imprisonment for the remainder of his natural life without benefit of probation or parole or any other reduction.'"[12]

---

[11]    145 A.3d at 434.
[12]    153 A.3d at 70 (quoting § 4209(d)(2)).

6

That should dispose of Zebroski's challenge to the continuing vitality of section 4209. But based on the way that we answered that last certified question in *Rauf*, Zebroski maintains that we intended to invalidate the entirety of section 4209, which would mean that *Powell* was wrong to give any part of that statute continuing effect.

It is true that *Rauf* examined the severability of section 4209, but the severability question we addressed was not, as Zebroski believes, whether the capital punishment scheme could be severed from the alternative punishment of life without parole. Rather, we were concerned only with whether it was possible to sever the constitutionally-infirm parts of the capital punishment scheme from the constitutionally-sound ones in a way that would preserve the death penalty.[13] That, we said, was not possible. *Rauf* did not address whether the alternative life-without-parole sentence could be severed from the capital sentencing scheme. In *Powell*, we held that it could.

Zebroski contends that our decision in *Powell* overlooked an important distinction between section 4209, as it now reads, and a previous version of the statute. That previous version, passed in 1974, read in part as follows:

---

[13] That much is clear from the way that the certified question was phrased. The question did not ask whether the capital sentencing scheme, as a whole, is severable from the statute's life-without-parole alternative, but whether, "[i]f *any procedure in* 11 *Del C.*§ 4209's capital sentencing scheme does not comport with federal constitutional standards, can *the provision for such* be severed from the remainder of 11 *Del. C.* § 4209, and the Court proceed with instructions to the jury that comport with federal constitutional standards?" 145 A.3d at 434 (emphasis added).

7

> In any case in which a person is convicted of first degree murder the Court shall impose a sentence of death. If the penalty of death is determined to be unconstitutional the penalty for first degree murder shall be life imprisonment without benefit of parole.[14]

Zebroski seizes on the second sentence, which is not in the current version of section 4209. He argues that omission is evidence that the General Assembly no longer intends for the life-without-parole alternative to be severable from the capital sentencing scheme.

There is a more straightforward explanation. The 1974 statute, passed after we had twice struck down the State's previous capital sentencing schemes,[15] instituted a "mandatory death" regime in Delaware: death became the mandatory punishment for first-degree murder.[16] Because the statute did not provide any alternative, the General Assembly wrote a contingency into the statute in the event that this attempt too were to be invalidated (which, two years later, it was[17]). But when the General Assembly passed the current version of the statute, there was no need to carry over that contingency because the current version restored the option of a lesser sentence of life without parole, which could then be applied if the death penalty were again to be invalidated. The omission of that provision, then, does not have the significance Zebroski believes it has.

---

[14] Act of Mar. 29, 1974, § 2, 59 Del. Laws ch. 284.
[15] *State v. Dickerson*, 298 A.2d 761 (Del. 1972); *State v. Smith*, 324 A.2d 203 (Del. 1974).
[16] *State v. Sheppard*, 331 A.2d 142, 143 (Del. 1974).
[17] *State v. Spence*, 367 A.2d 983, 988 (Del. 1976).

We reiterate what we said in *Powell*. A defendant whose death sentence is vacated under *Rauf* and *Powell* must be resentenced to the punishment the General Assembly has specified as the alternative to death: life without parole.

## III

Zebroski contends that imposing a mandatory sentence of life without parole on him would violate the Eighth Amendment because he was only 18 at the time of the offenses. He acknowledges that the United States Supreme Court's decision in *Miller v. Alabama*,[18] which prohibits mandatory sentences of life without parole for juveniles, was limited to "those under the age of 18 at the time of their crimes,"[19] but he contends that "major advances in neuroscience have demonstrated that the brain of a teenager, even at the age of 18, is profoundly different from that of a mature adult."[20] That, to him, means that the protection *Miller* extended for those under 18 should apply with equal force to those who are 18.

*Miller* was the latest in a line of cases, beginning with *Roper v. Simmons* in 2005[21] and continuing with *Graham v. Florida* in 2010,[22] that categorically forbid certain sentences for juveniles. As the Court recognized in *Miller*, these decisions looked to "science and social science" to confirm that "juveniles have diminished

---

[18]    567 U.S. 460 (2012).
[19]    *Id.* at 465.
[20]    Appellant's Opening Br. 14.
[21]    543 U.S. 551.
[22]    560 U.S. 48.

9

culpability and greater prospects for reform," which in turn suggests that juveniles are "less deserving of the most severe punishments":

> In *Roper*, we cited studies showing that "[o]nly a relatively small proportion of adolescents" who engage in illegal activity "develop entrenched patterns of problem behavior." And in *Graham*, we noted that "developments in psychology and brain science continue to show fundamental differences between juvenile and adult minds"—for example, in "parts of the brain involved in behavior control." We reasoned that those findings—of transient rashness, proclivity for risk, and inability to assess consequences—both lessened a child's "moral culpability" and enhanced the prospect that, as the years go by and neurological development occurs, his "deficiencies will be reformed."[23]

All three of these cases defined juveniles, for the purpose of their categorical rules, as those under 18—a line the Court first drew in *Roper*.

Zebroski believes that line should be moved. His argument is straightforward. If *Miller*, like *Graham* and *Roper* before, rested on scientific evidence showing that there are "fundamental differences between juvenile and adult minds,"[24] and if—according to Zebroski—science has shown that those same developmental differences persist beyond the age of 18 and into early adulthood, then the punishments those cases proscribe for those under 18 should also be proscribed, at the least, for those who are only 18.

There are two problems with Zebroski's argument. The first is that the United States Supreme Court has already considered and rejected it. While Zebroski

---

[23]   *Miller*, 567 U.S. at 471–72 (citations omitted).
[24]   *Id.* (quoting *Graham*, 560 U.S. at 68).

10

suggests that only as a result of "major advances" in neuroscience has it become known that adolescent development continues beyond the age of 18, the Court was aware when it decided *Roper* that children do not transform into psychologically- and neurologically-mature adults on their eighteenth birthdays:

> Drawing the line at 18 years of age is subject, of course, to the objections always raised against categorical rules. The qualities that distinguish juveniles from adults do not disappear when an individual turns 18. By the same token, some under 18 have already attained a level of maturity some adults will never reach. For the reasons we have discussed, however, a line must be drawn.[25]

*Roper*'s choice of 18 as the constitutional age-of-majority was not, then, based on a now-outdated understanding of adolescent development. The Court simply rejected drawing the line any later.[26] On matters of federal constitutional law, we are bound by the Court's interpretations, so until the Court moves that line, we must respect its decision to reject advancing the line any further.[27]

---

[25] 543 U.S. at 574.

[26] Even if subsequent developments had undermined the reasoning in *Roper* and its progeny, the Court has repeatedly admonished that only it has "the prerogative of overruling its own decisions." *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989).

[27] A defendant not entitled to the benefit of the categorical rules laid down in *Miller*, *Graham*, and *Roper* (or the Court's other categorical Eighth Amendment rules) can still challenge whether the application of a particular sentence in a particular case is constitutionally disproportionate. But Zebroski has not endeavored to engage in the sort of fact-intensive analysis necessary to mount an individualized proportionality challenge, *see Graham*, 560 U.S. at 87–88, 91–93 (Roberts, C.J., concurring) (explaining and applying that framework), and we doubt in any event that he could succeed. The standard for proportionality under the Eighth Amendment is "highly deferential" to "the primacy of the legislature in setting sentences," *id.* at 87, and only "extreme sentences that are 'grossly disproportionate' to the crime" run afoul of the Constitution, *id.* (quoting *Ewing v. California*, 538 U.S. 11, 23 (2003) (plurality opinion)). As a result, "'successful challenges' to noncapital sentences" are "exceedingly rare." *Id.* (quoting *Rummel v. Estelle*, 445 U.S. 263, 272 (1980)). Zebroski committed among the most serious of crimes—first-degree murder—and it is

11

The second problem with Zebroski's argument is that the neurological similarities between 17-year-olds and 18-year-olds do not necessarily mean that the two should be treated the same under the Eighth Amendment. Although *Roper*, *Miller*, and *Graham* were all rooted in "psychology and brain science,"[28] *Roper*'s choice to divide childhood from adulthood at age 18 was not based solely—and perhaps not even primarily—on scientific evidence. After examining the "scientific and sociological" differences between children and adults, and using that evidence to show that juveniles tend to be less culpable for their behavior,[29] *Roper* then "retreat[ed]" from the science "to [a] more conventional, law-controlled analysis" when the time came to decide who would count as a juvenile:[30]

> The age of 18 is the point where society draws the line for many purposes between childhood and adulthood. It is, we conclude, the age at which the line for death eligibility ought to rest.[31]

---

"the murderers and rapists for whom the sentence of life without parole is typically reserved." *Id.* at 92. Worse still, Zebroski's offense was not a typical first-degree murder, if such a thing exists. He was convicted of intentionally killing someone while the process of committing another felony. That satisfied one of Delaware's statutory aggravating factors, *see* 11 *Del. C.* § 4209(e)(1)(j), which elevated his conduct above the mine-run of first-degree murders and placed him into the category of offenders for which the General Assembly reserved the possibility of death. To be sure, his "youth . . . and the difficult circumstances of his upbringing" tip in his favor, *see Graham*, 560 U.S. at 92 (Roberts, C.J., concurring); *Zebroski*, 715 A.2d at 83–84 (discussing the factors that mitigated against the death penalty), but it is "the rare case in which a threshold comparison of the crime committed and the sentence imposed leads to an inference of gross disproportionality," *id.* at 88 (quoting *Hamelin v. Michigan*, 501 U.S. 957, 1005 (1991) (Kennedy, J., concurring)), and this is not one.

[28]    *Miller*, 567 U.S. at 471–72 & n.5 (quoting *Graham*, 560 U.S. at 68).
[29]    *Roper*, 543 U.S. at 569–74.
[30]    Emily Buss, *What the Law Should (and Should Not) Learn from Child Development Research*, 38 Hofstra L. Rev. 13, 40 (2009).
[31]    *Roper*, 543 U.S. at 574.

The choice of age 18 was not, then, an attempt to identify—using the most advanced science of the time—the developmental boundary between childhood and adulthood. It was based on societal markers of adulthood—the age at which the states allow individuals to "vot[e], serv[e] on juries, [and] marry[] without parental consent."[32]

For Zebroski, this means that developments in neuroscience do not necessarily support moving the line that *Roper* drew. It was not science that convinced the Court where to draw that line—it was society's collective judgment about when the rights and responsibilities of adulthood should accrue. And in the twelve years that have passed since *Roper*, 18 is still "the point where society draws the line for many purposes between childhood and adulthood."

## IV

Zebroski raises two other constitutional challenges to his sentence. First, he contends that making life without parole the mandatory sentence (in lieu of death) for anyone who "intentionally causes the death of another person"—one definition of first-degree murder in Delaware[33]—makes Delaware an outlier. The fact that "a trier of fact in Delaware could convict a defendant of first-degree murder"—and expose the defendant to mandatory life without parole—"upon a mere finding that

---

[32]     *Id.* at 569.
[33]     11 *Del. C.* § 636(a)(1).

the killing was intentional" (without any aggravating factors) is, Zebroski says, an unusually low threshold for that punishment.[34]

Even if that were true—and we express no opinion on the matter—he would not be the right defendant to raise that challenge. Under his own analysis, more than half the states do not allow for parole as long as the conviction did not rest solely on the felony-murder doctrine or if some aggravating circumstance is present. And there was a statutory aggravating factor here, which elevated Zebroski's conduct into the category of death-eligible first-degree murders.[35] This is not a case where a defendant was convicted of first-degree murder "upon a mere finding that the killing was intentional" or by application of the rigid felony-murder rule, so by his own analysis, Delaware would not be an outlier for imposing sentence of life without parole under these circumstances.

Finally, Zebroski contends that imposing a sentence of life without parole would violate his due process rights because, at the time of his trial, he had not been "on notice that sentence of life without parole would be the only . . . sentence upon conviction of first-degree murder."[36] Zebroski suggests that if he had known at the time of his trial that the death penalty would be off the table, his "trial strategy would

---

[34]    Appellant's Opening Br. 13.
[35]    *See State v. Zebroski*, 1997 WL 528287, at *11 (Del. Super. Ct. Aug. 1, 1997) ("It is undisputed that a statutory aggravating circumstance exists in this case: the murder was committed during the commission of a felony. 11 *Del. C.* § 4209(e)(1)(j).").
[36]    Appellant's Opening Br. 16.

14

surely have been different."[37] Even if that were true, this argument proves too much. Under Zebroski's line of reasoning, all defendants convicted under a capital punishment regime that is later declared unconstitutional would be entitled to have their convictions vacated because their trial lawyers may have employed different strategies had the possibility of death not loomed over their cases. That has never been true in Delaware on any of the past occasions when the State's capital punishment scheme has been struck down, and Zebroski does not cite any authority for the notion that due process requires that relief.[38]

V

For the foregoing reasons, the judgment of the Superior Court is affirmed.

---

[37] *Id.*

[38] *See Gardner v. Florida*, 430 U.S. 349, 365 (1977) (Marshall, J., dissenting) ("I continue to believe that the death penalty is unconstitutional in all circumstances and therefore would remand this case *for resentencing to a term of life* . . . ." (emphasis added)); *Schick v. Reed*, 483 F.2d 1266, 1271 (D.C. Cir. 1973) (Wright, J., dissenting) ("Although the *Furman* decision itself simply remanded the death penalty cases for further proceedings without spelling out the nature of those proceedings, all courts considering the issue have recognized that retroactive application of *Furman* to any given prisoner requires that the death sentence be vacated and the judgment modified to provide for the appropriate alternative punishment . . . .").